The court held the matter for some time under advisement, in hopes that a compromise would have taken place between the parties ; but on the 27th of September, the Chief Justice delivered the following judgment.
McKean, Chief Justice.
I will state the case as it appears before the court, from the proceedings and the evidence, which are not controverted on either side ; and shall then take notice of those points which have been disputed.
The appellants, on the 28th day of August, 1779, were owners of a brigantine, called the Hibernia, then riding at anchor in the port of Philadelphia, and appointed the respondent master and commander, on a voyage from thence to Orotava, in the island of Teneriffe, having a commission as a letter of marque and reprisal. The owners, in the sailing orders then delivered to the respondent, (among other things) “ advised him to keep company with the armed vessels bound to the eastward, as far as he sho'ulcl think it prudent; and that should they agree to cruise two or three weeks on the coast, he had their approbation in joining with them.” The respondent sailed on his intended voyage, and in the river Delaware joined *the p,. brigantine Achilles, whereof George Thompson was master, and the [*181 *186 Patty, whereof John Prole was master, each having a commission of letter of marque ; and about the 1st of September following, they proceeded to sea in company, standing to the eastward.
On the 6th of September, in the forenoon, a firing of cannon was heard by the people on board the Achilles and Patty, and in the afternoon, the Achilles and Patty had altered their course, and being swifter sailors than the Hibernia, left her at some distance ; they then waited for her, and when she came up, she inquired the reason of their altering their course, and was informed, that they had seen two sail and given them chase. At this time, the two vessels were not in sight, the Achilles and Patty having waited for the Hibernia, until they were lost : They all three then continued the same course, until the morning, when, at daylight, two vessels were descried, lying close together, by each of the masters of the three brigantines, who forthwith made towards them ; and the Achilles and Patty, after firing a few guns, took possession of a brigantine, called the Betsey, which had been a British vessel, bound from Montserrat for New York (which places were then possessed by the enemy), and was captured, the day before, by the Argo sloopi of war, belonging to the United States, Silas Talbot, Esquire, Commander. At this juncture, the Hibernia was a few miles astern of the other brigantines, and when she came up, the respondent asked, “ what vessel they had brought too ?” and was answered, “ a brig from Montserrat, bound for New York ; a good prize.” In consequence of some conversation with the captains of the two ■ other vessels, the respondent sailed in pursuit of the Argo, then in sight, and did not rejoin them, until near sunset, when a boat came along side from the Patty, and asked for men to assist in navigating the Betsey into some port. The respondent immediately put two men into the boat, and signed orders for William McNeal, who had been appointed prize-master, which contained these words, “ to get her, if possible, into Delaware, Egg Harbor, or Chesapeake, for fear of the Sloop Argo falling in with you, if you go to New England;” and “beg of McNeal to stand to the southward, this night and strive hard for Philadelphia.” These orders are dated “the 7th September 1779, at sea, on board the brigantine Patty,” and were signed, first by John Prole and George Thompson. So far the facts are agreed.
Mr. William Davis, who was a passenger on board the Patty, swears, “that he verily believes, the firing of cannon on the 6th, about ten o’clock in the forenoon, was heard o.n board the Hibernia, and that the people on board each of thé three brigs saw two vessels engaged in fight, for that he heard and saw them distinctly ; that the three lay becalmed within hail of each other, that the Argo and Betsey were then about three leagues distant from the three brigs, and that the firing continued more than an hour.” He further is positive, that the respondent, and Prole and Thompson, had a consultation, in his presence, about the brig Betsey, whether she was prize *1821 *or not > and that they concluded to secure her as a prize, as they •' disbelieved what had been said by West and Church, about her being prize to the Argo, or if she was, yet, as they had been in sight at the time of the capture, they were entitled to a share. These facts are also confirmed by the deposition of John Groves.
On behalf of the respondent, the depositions of John Brice, first mate of the Hibernia, John Magiil, George Stout, George Eldridge and Aaron Ash- *187 bridge, mariners on board, and of Doctor Wilson Waters, surgeon of the Hibernia, prove, that they did not see the Argo and Betsey, nor hear any tiring of cannon, on the 6th of September, and that neither Captains Prole nor Thompson were on board the Hibernia on the 7th, nor was the respondent on board either of their vessels. In which last particular, Davis and Groves concur. These witnesses also differ with Davis and Groves, about the hour that the Hibernia sailed in pursuit of the Argo, the duration of the chase, and the time of her return and rejoining the other brigs.
It has also been given in evidence, that a suit had been instituted in the admiralty by Captain Silas Talbot, qui tarn, &o., against the owners of the three brigantines, for the spoliation of the Betsey and her cargo, who, upon an appeal to this court, were decreed to pay 11, 141l. 5s. 4d. damages to the libellant, besides the costs, of which sum the present appellants, as owners of the Hibernia, paid 3795l. 35. 6d., and towards costson the 22d January-1785, (a)
Upon this state of the case, two questions arise : The 1st of fact; the 2d of law.
1st. With respect to the fact, there are two points : 1st. Whether the respondent did willingly join the two other captains, Prole and Thompson, in the tortious capture of the Betsey from the Argo, knowing her to have been a prize to the Argo, and that the Argo was a friend ? This would undoubtedly have been a lata culpa, an evident trespass, to call it by no harsher name.
If he did not, then, 2d. Whether he was guilty of such gross negligence (crassa negligentia) as by law will make him responsible to the appellants, considering the relation between them as owners and master of a vessel ?
As to the 1st point, the evidence is not so satisfactory as might be wished in a ease of such consequence to the parties. Had there been evidence given respecting the credit of.the several witnesses, the matter would have been clearer. If Davis and Groves are to be credited, in addition to the other evidence, there is a very strong presumption indeed, that the respondent is guilty of a great wrong, of a clear trespass ; for if he saw the fight on the 6th, as he next day found that the Betsey, which had been captured, was an enemy, he must have concluded, that the Argo was a friend. And if all that the other witnesses swear in behalf of the respondent, is true, yet I do not think, that the evidence of Davis and Groves is thereby invalidated. With respect to hours or times, in which particular occurrences or transaction's happened, witnesses of thr greatest integrity *may and p. „o often do differ : this has happened, in the cause before us. But as to L other matters, the witnesses on board the Hibernia only swear, “ that they did not see nor hear, what the others say, they did.” The rule in such a case is, “ that one affirmative witness countervails the proof of many negative, because both may swear true,” and such interpretation should be put on the whole testimony, as to reconcile it ; for, one may see and hear what another does not. Gilb. Law of Evidence 157. However, it does not appear necessary to determine this first point, as the second question admits of little difficulty, viz., whether the respondent has been guilty of such gross negligence as should make him responsible ?
*188 The respondent was near to the Betsey, as well as the two other letters of marque ; he might have gone on board her, and made every necessary and proper inquiry ; he sent two of his crew on board her, to get her, if possible, into Delaware, Sac.; he signed the order to McNeil, the prize-master, which must have shown, to perfect conviction, that the Betsey had been captured by the Argo, and that she was a friend. But it is said, that he confided in Prole, whom they had made commodore, and in Thompson ; that they deceived him ; and that he signed the orders to the prize-master, without reading them; and, in short, that he implicitly obeyed, and did whatever he was told to do. * The respondent should have reflected, that the seizing a valuable vessel and cargo, was a serious piece of business, if belonging to a friend ; he should, therefore, have weighed the consequences of his credulity in others ; he could have inquired for himself, and had the same evidence with'Prole and Thompson ; he should have considered,' that his owners placed their confidence in him, and in no other ; he should have acted for himself, and taken care that he did no injury to any one. But he does not appear, by the defence made for him, to have exercised his own judgment at all. Was this using proper care and diligence, or was it inexcusable conduct, and gross negligence ?
2. Let us now consider the law upon this evidence ; for, ex facto oritur lex. It is agreed, that every one of the parties to a trespass, who participates in it, is a trespasser, and an action will lie against him as a principal; for there can be no accessary to a trespass, Bro. trespass, pl. 113; 1 Lev. 124: that a trespass was committed in taking and carrying away the Betsey from the commander of the Argo ; that the respondent was present, aiding and assisting in the taking and carrying her away : and that Captain Silas Talbot could have maintained his suit against the respondent, as well as against his owners, for the wrong and injury they have done to him. But it is contended, that though he might bo responsible to Captain Talbot, he is not so to his owners, for that his relation with them was by contract, and the contract between a servant and his master, or between the master of a ship and his owners, points out the measure of the servant’s or master’s responsibility ; that he ought not to be accountable in damages for an error in judgment, but only for the fault of the heart, and that he acted according sa'l t0 *kest of his judgment; and his error in this business arose [*184 from the misinformation and deception of Prole and Thompson. In support of this doctrine were cited 1 Black. Com. 422, 309; 3 Id. 163; 3 Bac. Abr. 544, 564; 4 Co. 83, 84; 10 Mod. 109; 4 Burr. 2060; 11 Mod. 135.
In reply to this, it has been argued, that the master or commander of a privateer or letter of marque, may lawfully stop the ship of a friend, examine her papers, the people on board, the cargo, <&c., in order to discover, whether she belongs to a friend or an enemy ; and if upon the whole it should be doubtful, to bring her into port, for further inspection and trial, without breaking bulk, or embezzlement of the lading. But if the captor embezzled the cargo, disposed of or used any part of it, sent away the captured mariners, or did any other acts, which show he could have no reasonable doubt, in such case, he is liable for damages and costs. Lee on Captures, 202, 240; Beawes L. M. 207; 1 Roll. Abr. 530.
It is insisted upon, that a master of a ship is one, who, for his knowledge in navigation, fidelity and discretion, hath the government of the ship *189 committed to his care and inanagement; that he must give an account foi the whole charge, and, upon failure, render satisfaction : and therefore, if misfortunes happen, if they are either through the negligence, wilfulness 01 ignorance of himself or mariners, he must be responsible ; and his owners may sue him for reparation of damages, jointly or separately, both according to the common law and marine law. See 1 Vol. Laws of Admiralty 186; Beawes L. M. 49; Buller’s Nisi Prius 24; 3 Keble 444; 3 Bac. Abr. 564; 3 Black. Com. 163.
A great loss, then, has been sustained by the injury done in the seizure of the Betsey ; it will be heavy, and must finally fall upon the owners or master. If the bringing the Betsey too, for the purpose of inquiring whether she belonged to a friend or an enemy, was lawful, the subsequent conduct was unlawful, and the seizors came thereby trespassers ab initio.
This was a lata culpa in Prole and Thompson, at least, the respondent was present aiding and assisting in carrying her away from the Argo. If one does a trespass, and others do nothing but come in aid, yet all are principal trespassers. Bro. Trespass, pl. 232, 20; Vin. Abr. 460, title Trespass, pl. 3, and fo. 466, letter U. If A. comes in aid of B., who beats me, yet he is a trespasser as well as B. 22 Ass. 43. If the conduct of the respondent was not wilful and with full knowledge, yet it appears to us have been a crassa negligentia, and that any reasonable man, upon inquiry, and the least reflection, upon reading the orders given to the prize-master McNeil (and he ought to have read them), or upon the circumstances attending the whole transaction, must have been satisfied, that the Betsey was a prize to the Argo. It is a wrong position, that a master of a ship is not answerable for an error in judgment, but only for the fault of the heart, in civil matters. In criminal cases, as well in others, as in a master of a ship, it is true. One non compos mentis is answerable civilly 'for *a wrong done to another. Reasonable care, attention, prudence and fidelity, are expected from the master of a ship, and if any mis- *- fortune or mischief • ensues from the want of them, either in himself or his mariners, he is responsible in a civil action. And it must appear very strange to any understanding, that the owners of a vessel should be answerable in damages for the misconduct of the master, merely because they appointed him master, and that the master, the actual malfeasor, should not be accountable over to them; that the innocent should suffer, and the guilty person go scot-free. We know of no such law.
Upon the whole, the Court are of opinion, that the sentence of the court of admiralty be reversed ; and this court do decree and adjudge, that the respondent do pay to the appellants the sum of 3795l. 3s. 6d., and the interest thereof from the 22d day of January 1785, together with the costs by them paid in the former cause by Silas Talbot, qui tarn, against them and others, and also the costs of this suit in the inferior court, and that each party shall pay their own costs in this court, the same to be taxed by the register, or this court.
Atlee and Rush, Justices, dissented from this opinion of the court, for reasons which they assigned separately and at large, (a)

 See ante, p. 95.

 The opinion of Judge Rush, which in the former editions was subjoined in the appendix, is now introduced in the proper place.