In re: Stella SCHEIDMANTEL.

Appeal of: Trustee Sky Trust, N.A., Appellant.

Superior Court of Pennsylvania.

Argued April 27, 2004.

Filed Jan. 5, 2005.

Reargument Denied March 18, 2005.

Perry A. Napolitano, Pittsburgh, for appellant.

John J. Petrush, Beaver, for appellee.

BEFORE: HUDOCK, GANTMAN and POPOVICH, JJ.

OPINION BY HUDOCK, J.:

¶ 1 This is an appeal from an order sustaining the grant of a surcharge and confirming as absolute the final account filed in this case. We affirm in part, reverse in part and remand for further proceedings.

¶ 2 In 1998, Stella N. Scheidmantel (Grantor) executed an instrument of trust creating a revocable inter vivos trust titled the "Stella N. Scheidmantel Living Trust dated July 29, 1998" (the Trust, or the Scheidmantel Trust). *See* Declaration of Trust, 7/29/98, at 14 (Article Seventeenth) (defining "short name" of the Trust). The Scheidmantel Trust named as trustee Century National Bank & Trust Company (Century National). Appellant Sky Trust, N.A. (Sky Trust or Trustee) is the successor-in-interest to Century National and became substitute trustee effective as of January 1, 2000. Sky Trust is a wholly owned subsidiary of Sky Financial Group, Inc. (Sky Financial), a publicly traded corporation whose common stock is designated by the symbol "SKYF" on the NASDAQ stock market exchange. The Scheidmantel Trust named Grantor's husband, Paul E. Scheidmantel (Life Tenant), as beneficiary during his lifetime. Upon the Life Tenant's demise, the trust instrument directed Trustee to distribute the trust corpus to the Grantor's then living issue, "discharged of trust," in equal shares *per stirpes. See* Declaration of Trust, 7/29/98, at 1 and 5 (identifying beneficiaries to the Scheidmantel Trust). The Life Tenant died on December 9, 2000. On that date, Grantor's three children, Paul E. Scheid-

mantel, Jr., Paula S. Wescott, and Marleigh P. Zimmerman (the Remaindermen), all were living.

¶ 3 Originally, the trust estate consisted of property delivered by Grantor to Century National on August 13, 1998, comprising fifteen certificates of deposit issued by First Western Bancorp, Inc. (FWBI) and 13,214 shares of common stock in FWBI. The record indicates that the certificates of deposit initially were valued at $155,931.73. However, the record is unclear as to the value of the FWBI common stock on the delivery date.[1] Sky Financial acquired FWBI in August of 1999. On August 13, 1999, the 13,214 shares of FWBI stock held as part of the trust estate were exchanged for 16,002.15 shares of SKYF stock. SKYF consistently paid both cash dividends and stock dividends. On November 2, 1999, the Trustee received 1,600.2 shares of SKYF stock as a ten percent stock dividend on the trust estate's existing stock holding.

¶ 4 Grantor died on March 3, 1999. Despite the fact that Grantor's assets were delivered to the Scheidmantel Trust on August 13, 1998, no portfolio review was performed until March 10, 1999, after Grantor's death. Deposition testimony from the portfolio manager, introduced as evidence at the hearing conducted on November 21, 2002, indicates that Trustee's policy is to perform the first portfolio review within sixty days of a trust's funding, and that is "an unusual situation" for a first review to occur more than seven months after funding. N.T., 11/21/02, at

1. The certified record indicates that the 13,-214 shares of FWBI common stock were valued at $396,420.00 on March 6, 1999, the date of valuation for purposes of the inheritance tax return filed after Grantor's death. *See* Pennsylvania Inheritance Tax Return, dated 10/29/99, Statement of Account (explaining property comprising the Trust's corpus).

Trustee avers that on August 13, 1998, the value of the stock was $27.00 per share, totaling $356,778.00. Trustee's Brief at 7. However, Trustee's citation to its purported source for these figures refers to matter in the reproduced record that does not speak to the value of the stock on that date.

13–14. Trustee is not responsible for any default in this regard because Century National was still acting as trustee at that time. We do note, however, that when Century National performed the first portfolio review, the goal of the Scheidmantel Trust was defined as "safety and income." *Id.* at 14.

¶ 5 After his wife's death, Life Tenant rapidly became debilitated to the extent that he could not take care of himself and could no longer remain in his home. In August of 1999, approximately six months after Grantor's death, Life Tenant moved into a nursing home. N.T., 11/21/02, at 32. Life Tenant's health deteriorated rapidly during the last six months of his life. *Id.* at 33, 35. The testimony of Life Tenant's son, Paul E. Scheidmantel, Jr., was unequivocal that Trustee never consulted him concerning the Life Tenant's health or circumstances (financial or otherwise) at any time during the twelve months preceding his father's death. *Id.* at 33. Life Tenant's daughter, Paula Wescott, indicated that Trustee never consulted her on any matter implicated by the Scheidmantel Trust. *Id.* at 35–36. The third Remainderman, Marleigh P. Zimmerman, did not testify.

¶ 6 On June 26, 2000, Thomas J. Oehmler (Oehmler) commenced employment with Trustee as a portfolio manager and was assigned to handle the Scheidmantel Trust. (Oehmler has since been promoted to the position of Trustee's Western Pennsylvania Regional Manager.) Oehmler indicated that his reading of the Declaration of Trust led him to conclude that Grantor's investment goal was to "take advantage of estate [tax] planning, not necessarily to provide income." N.T., 11/21/02, at 20–21 (as corrected at 31). As discussed below, we cannot agree with Oehmler's legal conclusions regarding Grantor's goals when establishing the Trust.

¶ 7 On June 30, 2000, four days after Oehmler commenced employment with Trustee, an "annual account investment review" was performed for the Scheidmantel Trust. At that time, Oehmler changed the investment objective from "safety and income" to "balanced." Deposition, 8/16/02, at 27. Oehmler explained that the distinction between the two objectives relates to asset allocation "among equity asset classes, and cash." *Id.* at 35, 37. According to Oehmler, a "balanced objective" may allocate fifty to seventy percent to stock, with the remaining assets in fixed income and cash. *Id.* at 37. However, a "balanced income objective" may allocate forty to sixty percent of the assets in stock with the remainder held as fixed income assets and cash. *Id.* at 37. Originally, the Scheidmantel Trust's "horizon" (the "expected life" of the trust) was defined as three to seven years. *Id.* at 31–32, 38. Under Oehmler's aegis, the horizon was increased to seven to ten years. *Id.* at 44. Oehmler could give no reason to explain why he decided to lengthen the Scheidmantel Trust's horizon despite the fact that the Life Tenant's health was rapidly deteriorating. *Id.* Nor could he explain the discrepancy between his perception of the goal of the Scheidmantel Trust and the goal of "safety and income," which was defined pursuant to the first portfolio review. *Id.*

¶ 8 The corpus of the Scheidmantel Trust remained the same, except for additions of cash and SKYF stock, from its inception until September of 2000. At that time, without consulting the Life Tenant or the Remaindermen concerning the state of the Life Tenant's health and the extent of his projected income needs, the Trustee began diversifying the Trust's holdings. Trustee correctly indicates that the trust instrument does not require consultation with any of the beneficiaries as to the sale

or retention of specific assets. However, as noted above, the Trust's investment goal and horizon also were changed without any inquiry concerning the Life Tenant's medical and financial status.

¶ 9 When he was deposed in August of 2002, Oehmler could not explain why these alterations were made to the Trust. Nevertheless, three months later, at the hearing conducted on November 21, 2002, Oehmler stated that the goal change was effectuated because ownership of the SKYF common stock represented "too high a concentration in one name" and it was prudent to allocate ownership "into a greater diversity of vehicles." N.T., 11/21/02, at 41–42. Oehmler stated that his decision to diversify was not predicated on a belief that the SKYF stock might become worthless or suffer a substantial decline in value. Id. at 25–26. Furthermore, Oehmler conceded that he had no reason to think that the SKYF stock was unsound. Id. at 30.

¶ 10 In the fall of 2000, Sky Financial publicly reported a third quarter stock dividend. Oehmler knew the dividend had been announced, but elected to sell 8,000 shares of SKYF stock before the ex-dividend date (the date on or after which the buyer of a security does not acquire the right to receive a recently declared dividend). The buyer receives the dividend if a stock is sold after declaration of the dividend but before the ex-dividend date. Black's Law Dictionary 608 (8th ed.2004). Conversely, the seller receives the dividend if a stock is sold "ex dividend," i.e., on or after the ex-dividend date. Id. A stock's price normally falls for a short time after the ex-dividend date in an amount approximating the value of the dividend. Id. at 608–09. See also N.T., 11/21/02, at 50 (testimony of Ralph Edward Duckworth, Jr. (discussing impact of ex-dividend date)).

¶ 11 Instantly, Trustee sold the SKYF stock before the ex-dividend date and the Trust lost the dividend.[2] Oehmler did not explain why, in this particular case, he deemed it prudent to execute the stock sale immediately rather than waiting for the stock to go ex dividend. On that date, the Trust retained only 9,692.35 shares of SKYF stock. Thus, the Trust lost 800 of the shares it would have earned upon payment of the ten percent stock dividend and received only 960.2 shares. The trial court found that Trustee's timing election for the sale of the 8,000 shares of SKYF stock resulted in direct losses to the Scheidmantel Trust totaling $45,674.94. Opinion and Order, 3/17/03, at 6. Additionally, on September 28, 2000, Oehmler proposed liquidating assets yielding over $8,000.00 in annual cash income and purchasing assets yielding only $3,000.00 in annual cash income. Opinion and Order, 3/17/03, at 6 (Factual Finding 48). Oehmler knew the asset exchange would cost the Trust approximately $5,000.00 in annual income. N.T., 11/21/02, at 17. Nevertheless, his plan was implemented.

2. Trustee contends it should not be charged with advance knowledge of the dividend because Pennsylvania courts recognize the existence of a so-called "Chinese Wall" between the commercial and trust departments of financial institutions. Trustee's Brief at 19 n. 16. Trustee also asserts that a trust department may not lawfully acquire information from another department of that institution unless the data is generally available to the market. Id. We do not disagree. However, we find the point irrelevant because the Trial Court's opinion clearly refers to matter of public record when discussing the timing of Trustee's sale of SKYF stock and not to information that could be acquired only in an unlawful manner. Trustee does not contend that it was precluded from taking notice of a publicly announced dividend.

¶ 12 Between September 29, 2000, and December 1, 2000, Trustee purchased shares in several mutual funds for the purpose of "growing" the capital assets of the Trust on a long term basis. When Life Tenant died December 9, 2000, it immediately became Trustee's responsibility to liquidate the Trust and distribute all assets "free of trust" to the Remaindermen. Nevertheless, on December 29, 2000, twenty days after the Life Tenant's death and two days before the end of the year, the Trustee purchased shares in three additional mutual funds. The record is silent regarding the cost to the Trust (if any) stemming from the end-of-year fees and expenses normally associated with mutual funds as assessed against either these new acquisitions or the other mutual fund holdings.[3]

¶ 13 The following month, Trustee began liquidating the Trust assets so the corpus could be distributed free of trust. Certain mutual fund shares were liquidated on January 23, 2001. These were institutional shares which could be held only by institutional investors, not by individuals. They could not be distributed "in kind" to the Remaindermen as the shares of SKYF stock could have been distributed. N.T., 11/21/02, at 28–29. Thus, the mutual fund shares had to be liquidated regardless of whether it was advantageous or disadvantageous to sell at that time. Id. at 29, 42–43. Oehmler explained that the reason for purchasing institutional shares is that the expense ratio generally is lower than it is for retail shares. Id. at 43. He also indicated that, in his opinion, a lower expense ratio favors a trust's beneficiaries. Id.[4]

¶ 14 The record is silent as to the expense ratios attributable to the mutual funds purchased for the Trust. The certified record also lacks evidence of whether Rule 12b–1 fees or any other end-of-year expenses were payable for the mutual funds held by the Trust.[5] Furthermore, no testimony was adduced concerning fees charged (if any) by an entity other than Trustee for the sale of the SKYF stock and the acquisition of the mutual fund shares. In brief, the record does not disclose the cost to the Trust of holding mutual fund shares versus shares of common stock nor does it reveal whether there were acquisition fees, sale fees, and management fees attributable to the mutual funds themselves, independent of Trustee's management fees.

¶ 15 Oehmler merely stated that, as a general matter, mutual funds have multiple classes of shares, and that, "typically," institutional shares are not subject to either a front-end or back-end load in the

---

3. We note that there is no claim of churning in this case. "Churning" is excessive trading of a client account to earn fees and commissions instead of furthering the client's interests. Black's Law Dictionary 258 (8th ed.2004). The practice is illegal under securities law. Id.

4. The "expense ratio" of a mutual fund comprises the operating costs (including management fees) expressed as a percentage of the fund's average net assets for a given time period. The expense ratio does not include brokerage costs and various other transaction costs that also may contribute to a fund's total expenses. See InvestorWords.com at http://www.investorwords.com/1844/expense ra-

tio.html. Mutual funds sometimes are subject to a so-called "hidden load" in the form of a 12b–1 fee. Id. at http://www.investorwords.com/2304/hidden_load.html.

5. Mutual funds may be subject to a so-called "hidden load" in the form of a Rule 12b–1 fee. A "Rule 12b–1 Fee" is charged by some mutual funds to cover promotion, distribution, marketing and sometimes commissions to brokers. A genuine no-load fund does not impose Rule 12b–1 fees. However, some funds that call themselves "no-load" do impose this fee. See InvestorWords.com at http://www.investorwords.com/4/12b_1_fee.html.

form of brokers' commissions. *Id.* at 42. Oehmler specifically indicated that Trustee does not receive "commissions" for the purchase of mutual fund shares. *Id.* at 42. However, his testimony did not explain how and when the mutual funds themselves are compensated for managing their respective portfolios.

¶ 16 As noted above, the trust instrument required Trustee to distribute the trust corpus to the Remaindermen upon the demise of both the Grantor and the Life Tenant. The Life Tenant died December 9, 2000. However, Trustee did not file its First and Final Account (Account) until May 24, 2002, almost a year and a half after the Life Tenant's death. Two of the Remaindermen, Paul E. Scheidmantel, Jr. and Paula S. Wescott (Objectors), filed objections to the Account on June 6, 2002. Trustee filed its Audit Statement for Distribution the next day. The Objectors asserted that the fees paid to Trustee were unjustified, that Trustee had failed to perform its duties in a timely and/or diligent manner, and that the partial divesture of SKYF stock in exchange for less valuable institutional mutual fund shares yielding lower income constituted a breach of fiduciary duty and a breach of trust.

¶ 17 The matter proceeded to a hearing conducted on November 21, 2002. The trial court entered an opinion and order, the functional equivalent of an adjudication and decree *nisi*, on March 17, 2003.[6] On April 4, 2003, Objectors filed exceptions. Trustee did not file exceptions, but did file a notice of appeal on April 14, 2003. In response, Objectors filed a notice of cross-appeal. *See* Notice Cross–Appeal, 4/21/03 (indicating that the cross-appeal was filed to preserve their appellate rights but noting that Trustee's appeal appeared to be interlocutory and premature). The trial court directed Trustee to file a Rule 1925(b) statement.

¶ 18 On May 5, 2003, Trustee filed a motion to strike Objectors' exceptions alleging that Trustee's notice of appeal rendered the exceptions a nullity. Trustee also filed its Rule 1925(b) statement on that date. Subsequently, Trustee filed a motion with this Court for stay of trial court proceedings pending disposition of appeal. We denied Trustee's motion. On May 22, 2003, we quashed Trustee's appeal as interlocutory and dismissed Objectors' cross-appeal as moot.[7] The trial court entered an order on May 27, 2003, ruling on Objectors' exceptions to the opinion and order of March 17, 2003. Thereafter, on June 16, 2003, the trial court confirmed the Account as absolute (as modified by the orders of March 17 and May 27, 2003). Trustee's timely notice of appeal followed. The trial court did not require Trustee to file a second Rule 1925(b) statement and did not file an opinion pursuant to Rule 1925(a). The Objectors did not file a cross-appeal.

¶ 19 Trustee raises four issues for our consideration:

1. Did the Trustee's decision to diversify a trust portfolio by selling a portion of the [Scheidmantel] Trust's disproportionately large holdings in the Trustee's own parent company's

---

6. On December 17, 2003, amendments to the Pennsylvania Rules of Civil Procedure were promulgated abolishing the separate action in equity and merging claims for equitable relief into the civil action. The amendments did not take effect until July 1, 2004, and do not apply to this case.

7. Subsequently, on August 4, 2004, this Court filed *In re Estate of Cherwinski*, 856 A.2d 165 (Pa.Super.2004), in which the majority held that an order imposing a surcharge on a trustee is final and appealable. The dissent in *Cherwinski* maintained that an order imposing a surcharge is not, in and of itself, final for appeal purposes.

stock constitute "gross negligence" where no investment plan is specified by the governing instrument and where the Trustee acted reasonably, prudently and in good faith?

2. Did the trial court err in surcharging the Trustee for attempting to grow [sic] the portfolio by moving proceeds on the sale of stock out of a temporary investment in a money market account and into longer term equity and fixed income investments, where the surcharge was based solely on the court's view that the Trustee was bound to keep assets in the short term fund because of the then estimated income yields of the investments?

3. Did the trial court err in surcharging the Trustee for the sale of stock when the trial court calculated the surcharge using hindsight, based upon pre- and post-distribution lost appreciation and future dividends, and the difference between the value of shares upon sale and the subsequent high value of such shares, where the Trust instrument did not require the Trustee to retain the stock?

4. Did the trial court err in concluding that the Trustee did not act reasonably expeditiously under the circumstances to wind up the [Scheidmantel] Trust and distribute the estate and that the Trustee violated the Declaration of Trust by not promptly making distribution?

Trustee's Brief at 3. Because certain underlying questions are inextricably intertwined, we paraphrase the claims as follows: (1) did the trial court commit either an abuse of discretion or an error of law in determining that Trustee did not adhere to the standards imposed by Pennsylvania law and by the Declaration of Trust itself when embarking on the diversification program followed in this case; (2) did the trial court employ an improper method of calculating the amount of the surcharge; and (3) did the trial court err in concluding that Trustee failed to act in a reasonably expeditious manner to wind up the Trust and distribute the funds to the Remaindermen?

■ ¶ 20 The Pennsylvania Bankers Association (PBA) has filed an amicus curiae brief raising additional issues. These contentions are not properly before us for resolution. An amicus curiae brief is limited to those questions already before an appellate court as raised by the parties to an appeal. Pa.R.A.P. 531(a). An amicus curiae is not a party and cannot raise issues which have not been preserved and raised by the parties themselves. Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc., 832 A.2d 501, 506 n. 2 (Pa.Super.2003), appeal denied, 577 Pa. 724, 847 A.2d 1288 (2004). We shall consider the PBA's contentions only insofar as they pertain to issues raised by the parties.

■ ¶ 21 Before addressing Trustee's various arguments, we first must set out the applicable standard of review, as well as the proper legal standards. Our standard of review over the findings of the orphans' court is deferential. In re Estate of Harrison, 745 A.2d 676, 678 (Pa.Super.2000):

The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and

observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

*In re Estate of Cherwinski*, 856 A.2d 165, 167 (Pa.Super.2004).

¶ 22 When the trial court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. *Paden v. Baker Concrete Construction, Inc.*, 540 Pa. 409, 412, 658 A.2d 341, 343 (1995). "[I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power." *Id.* "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence [of] record, discretion is abused." *Id.* A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous. *Id.*

¶ 23 We are not constrained to give the same level of deference to the orphans' court's resulting legal conclusions as we are to its credibility determinations. *Estate of Harrison*, 745 A.2d at 678. We will reverse any decree based on "palpably wrong or clearly inapplicable" rules of law. *Horner by Peoples National Bank of Central Pennsylvania v. Horner*, 719 A.2d 1101, 1103 (Pa.Super.1998). Moreover, we are not bound by the chancellor's findings of fact if there has been an abuse of discretion, a capricious disregard of evidence, or a lack of evidentiary support on the record. *Id.* If the lack of evidentiary support is apparent, "reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law." *Id.* (quoting *Union Trust Company of New Castle v. Cwynar*, 388 Pa. 644, 649, 131 A.2d 133, 135 (1957)). Nevertheless, we will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record. *Estate of Harrison*, 745 A.2d at 681.

¶ 24 Trustee first complains that the trial court erred in concluding that the decision to diversify the Scheidmantel Trust's portfolio constituted "gross negligence" in light of the factual circumstances surrounding this case. To properly address this issue, we must explain the statutory law that governs it. On June 25, 1999, our legislature adopted the Prudent Investor Rule (the Rule),[8] based on the Uniform Prudent Investor Act, and made it part of the Probate, Estates and Fiduciaries Code (PEF Code).[9] Although sections 7206 (governing delegation by a fiduciary) and 7208 (regarding acquisition and retention of life insurance policies) were immediately effective, most sections of the

8. 20 Pa.C.S.A. §§ 7201–7214 (1999, June 25, P.L. 212, No. 28, § 2, generally effective in six months).

9. 20 Pa.C.S.A. §§ 101–8814.1. In 1974, the heading of Title 20 was changed from "Probate, Estates and Fiduciaries" to "Decedents, Estates and Fiduciaries." However, the short title was not altered and remains the "Probate, Estates and Fiduciaries Code." 20 Pa. C.S.A. § 101. Title 20 commonly is called the "PEF Code," and we shall apply that abbreviation.

Rule did not become effective for six months, or until December of 1999. Section 7204, the provision that governs and requires diversification of trust investments, became effective on December 25, 1999. *Id.,* § 7204 (Historical and Statutory Notes). However, as discussed below, section 7204 exempts any trust which became irrevocable prior to December 24, 1999. *Id.,* § 7204(b)(1). The Scheidmantel Trust became irrevocable before that date. Therefore, section 7204 does not apply to the present appeal.

¶ 25 The laws in force at the time and place of a trust's creation become part of the obligation of the contract of trust and have the same effect as if they were incorporated expressly in the trust instrument's terms. *In re Trust Estate of Pew,* 411 Pa. 96, 107, 191 A.2d 399, 405–06 (1963), *overruled on other grounds by Estate of Tyler,* 474 Pa. 148, 153, 377 A.2d 157 (1977).[10] The diversification requirement was new to Pennsylvania law when the Rule was passed. Thus, although most provisions of the Rule apply to all actions taken by a trustee after the relevant effective date, the legislature specifically exempted existing trusts from the diversification mandate under certain conditions:

> This section is not made applicable to existing trusts because Pennsylvania had not required diversification, and because the modern notion of diversification includes the duty to diversify types of investments as well as individual investments. Retroactivity would have required drafters of old trusts to have

been clairvoyant to have negated a **nonexistent duty to diversify.**

20 Pa.C.S.A. § 7204 (Official Comment, 1999) (emphasis added). The Official Comment also states that the reasonable diversification requirement of the statute does not impose the "extreme diversification" mandated by "modern portfolio theory." *Id.*

¶ 26 The diversification requirement of the Rule does not apply to any trust which became irrevocable prior to December 25, 1999. 20 Pa.C.S.A. § 7204(b)(1). The Scheidmantel Trust became irrevocable when Grantor died on March 3, 1999. However, even though the section 7204 diversification requirement is inapplicable, section 7205, which governs the retention of inception assets, does apply to the actions of Trustee taken on or after that section's effective date of December 25, 1999:

> A fiduciary, in the exercise of reasonable care, skill and caution, may retain any asset received in kind, even though the asset constitutes a disproportionally large share of the portfolio.

20 Pa.C.S.A. § 7205. Thus, even if Trustee had been under a duty imposed by section 7204 to diversify in this case, the exercise of Trustee's power to fulfill this duty would have to be assessed in light of the statutory authority conferred by section 7205 to retain inception assets.

¶ 27 As the trial court correctly held, Trustee's decision to diversify must be evaluated according to the provisions of

---

10. *Trust Estate of Pew* was overruled because of alterations in trust law between 1945 and 1977 concerning allocation of income and capital assets among income beneficiaries and remaindermen. The question of whether to apply the legal changes prospectively or retroactively finally was settled by *In re Trust of Catherwood,* 405 Pa. 61, 173 A.2d 86 (1961) and *Tyler,* which thereby overruled *Trust Es-*

*tate of Pew.* This issue has no bearing on the present appeal. *See generally Estate of Pew,* 440 Pa.Super. 195, 655 A.2d 521, 525–27 (1994) (discussing Rule Against Accumulations, Rule of Apportionment, Uniform Principal and Income Act of 1945, Principal and Income Act of 1947 and impact of conflicting Supreme Court rulings).

the Declaration of Trust as governed by the standard established by all applicable statutory provisions and the well-settled prior case law. *See* Trial Court Opinion, 3/17/03, at 9. We cannot accept Trustee's position that the trial court erred by applying the substantive law of Pennsylvania when determining the meaning of the provisions of the Declaration of Trust. As stated above, the laws in force at the time and place of a trust's creation become part of the obligation of the contract of trust and have the same effect as if they were expressly incorporated in the trust instrument's terms. *In re Trust Estate of Pew*, 411 Pa. at 107, 191 A.2d at 405–06.

¶ 28 Pennsylvania follows the view of the Restatement of Trusts that when discretion is conferred upon a trustee with respect to the exercise of a power, its exercise is not subject to control by the courts, except to prevent an abuse by the trustee of his discretion. *Geron v. Kennedy*, 381 Pa. 97, 101, 112 A.2d 181, 183 (1955) (citing Restatement of Trusts § 187 (1929)). However, even when there is no evidence of bad faith or improper motive, the exercise of discretion by trustees is subject to the limitation that they must not act outside "the bounds of reasonable judgment." *In re Briggs' Estate*, 150 Pa.Super. 66, 27 A.2d 430, 433 (1942). No matter how wide the field within which trustees may act, courts will control them when they act beyond that field. *Id.* How wide the field is depends upon the terms of the trust, the nature of the power to be exercised and all the circumstances surrounding a challenged transaction. *Id.* The real question is whether it appears from the record that the trustees acted in "that state of mind" contemplated by the grantor of the trust. *Id.* (citing Restatement of Trusts § 187 (1929)). A trustee may be found to have breached his duty of trust if he fails to exercise his discretion in

a manner consistent with the document that created the trust. *Id.*

¶ 29 In pertinent part, the Declaration of Trust for the Scheidmantel Trust describes the powers of the Trustee in the following language:

In the administration of any property at any time forming a part of the trust estate, including accumulated income, and in the administration of any trust created hereunder, the Trustee in addition to and without limitation of the powers conferred on trustees under the Pennsylvania Probate, Estates and Fiduciaries Code, as amended or any successor thereto, or otherwise provided by law, shall have the following powers to be exercised in the absolute discretion of the Trustee, except as otherwise expressly provided in this Agreement:

(a) To retain such property for any period, whether or not the same is of the character permissible for investments by fiduciaries under any applicable law, and without regard to the effect any such retention may have upon the diversity of investments;

(b) To sell, transfer, exchange, convert or otherwise dispose of, or grant options with respect to, such property, at public or private sale, with or without security, in such manner, at such times, for such prices, and upon such terms and conditions as the Trustee may deem advisable;

(c) To invest and reinvest in common or preferred stocks, securities, investment trusts, bonds and other property, real or personal, foreign or domestic, including any undivided interest in any one or more common trust funds, whether or not such investments be of the character permissible for investments by fiduciaries under any applicable law, and without regard to the

effect any such investment may have upon the diversity of investments;

(d) To render liquid the trust estate or any trust created hereunder in whole or in part, at any time and from time to time, and to hold unproductive property, cash or readily marketable securities of little or no yield for such period as the Trustee may deem advisable . . . .

Declaration of Trust, 7/29/98, at 7–8 (Article Ninth).

¶ 30 Generally, this Court "will not interfere with the exercise of a discretionary power by a trustee 'unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of reasonable judgment.'" *In re Estate of Feinstein*, 364 Pa.Super. 221, 527 A.2d 1034, 1037 (1987) (quoting Restatement (Second) of Trusts § 187 comment e (1957)). Subject to the specific language of the trust instrument, a trustee acting consistently with the law of Pennsylvania must "exercise discretion in preserving the balance of interests between successive beneficiaries." *Id.* In the absence of legislation to the contrary, our law disapproves of presumptive or *per se* rules that could arbitrarily foreclose executors and trustees from opportunities to retain beneficial holdings. *Id.* Each case, therefore, must hinge on its own particular circumstances evaluated in light of the substantive law of Pennsylvania. *Id.* "We can only expect our fiduciaries to act with sound judgment and proper motives under the particular circumstances of each case." *Id.* at 1038.

¶ 31 The general test of fiduciary liability on the sale or retention of trust assets is "common prudence, common skill and common caution[.]" *In re Lentz' Estate*, 364 Pa. 304, 308, 72 A.2d 276, 278

(1950). Our Supreme Court has explained that the "general rule" is that "a trustee must exercise such prudence and diligence in conducting the affairs of the trust as men of average diligence and discretion would employ in their own affairs." *In re Musser's Estate*, 341 Pa. 1, 10, 17 A.2d 411, 415 (1941). In other words, the usual "standard of care imposed upon a trustee is that which a man of ordinary prudence would practice in the care of his own estate." *In re Estate of Scharlach*, 809 A.2d 376, 384 (Pa.Super.2002). However, "[i]f a fiduciary has greater skill than that of a person of ordinary prudence, then the fiduciary's standard of care must be judged according to the standard of one having this special skill." *Id.* (quoting *Estate of Pew*, 655 A.2d at 541). *Accord Estate of Lohm*, 440 Pa. 268, 273, 269 A.2d 451, 454 (1970).

[A] trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default. The trustee is under a duty to the beneficiary . . . and if the trustee has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has.

*In re Stirling's Estate*, 342 Pa. 497, 504, 21 A.2d 72, 76 (1941) (citations and quotations omitted).

¶ 32 When a corporate trustee holds itself out as possessing greater knowledge and skill than the average man, it places itself "under a duty to exercise a skill greater than that of an ordinary man and the manner in which investments were handled must accordingly be evaluated in light of such superior skill." *In re Estate of Killey*, 457 Pa. 474, 477–78, 326 A.2d 372, 375 (1974). *See generally id.*, 457 Pa. at 477–78, 326 A.2d at 374–75 (explaining why the Pennsylvania rule requires a trust company to provide more than ordinary

care, diligence and good faith). When challenged, the administration of every corporate fiduciary must be "carefully scrutinized" to determine whether it has "performed according to the higher standards required of it." *Estate of Knipp*, 489 Pa. 509, 513, 414 A.2d 1007, 1009 (1980).[11]

¶ 33 Standards imposed by the substantive law of Pennsylvania cannot be diluted by the separate provisions contained within a trust instrument. *In re Estate of Niessen*, 489 Pa. 135, 139, 413 A.2d 1050, 1052 (1980). However, if an instrument is explicit as to the duty owed by the trustee, those terms should govern because "[t]he nature and extent of the duties of a corporate trustee are primarily to be ascertained from the trust instrument." *Id.* (citing Restatement (Second) of Trusts, § 164 (1959)). In the present case, the Declaration of Trust sets forth explicitly the duty of care under which Trustee's performance must be evaluated:

> No Trustee shall be liable for acts or omissions in administering the trust estate or any trust created by this Agreement, except for that Trustee's own *actual fraud, gross negligence or willful misconduct.*

Declaration of Trust, Article Ninth, at 10 (emphasis added).

¶ 34 The longstanding rule in Pennsylvania is that if a grantor/beneficiary, with **knowledge** and for his own benefit, provides by contract for a trustee to employ a different standard of care than that imposed by our law, such a term may be binding. *Spring v. Hawkes*, 351 Pa. 602, 610, 41 A.2d 538, 541 (1945). "Of course, any limitation in a trust instrument of the duties of a trustee which is opposed to public policy, or which is illegal in any way will not be given effect[.]" *Gouley v. Land Title Bank and Trust Company*, 329 Pa. 465, 470, 198 A. 7, 9 (1938) (citing Restatement of Trusts § 166 (1935)). At least conceptually, provisions that exempt a trustee from liability except for gross negligence or willful and intentional breach of trust do not offend the public policy of Pennsylvania. *Id.*[12]

¶ 35 In the present case, Trustee adduced no evidence indicating whether Grantor was aware of the normal standard of care Pennsylvania law imposes on a trustee. Nor did Trustee demonstrate that Grantor was informed that the Declaration of Trust imposed a less onerous standard in this case. However, the Objectors made no attempt to adduce evidence on these points. Nevertheless, as discussed more fully below, we agree with the trial court that Trustee's conduct in this case falls within the category of "gross negligence." Therefore, our disposition of this appeal does not require us to resolve the question mandated by *Spring* of whether Grantor acted with "knowledge" when she signed the Declaration of Trust and agreed to permit Trustee to vary the standard of care applicable to the Scheidmantel Trust.

---

11. *Estate of Knipp* has been superseded by the Prudent Investor Rule as discussed in *Estate of Scharlach*, 809 A.2d at 387. However, the Rule compels the same result. "A fiduciary who represents that he has special investment skills shall exercise those skills." 20 Pa. C.S.A. § 7212.

12. *Gouley* was decided in 1938. Whether it represents current public policy as evidenced by the Prudent Investor Rule is a question to be resolved by our Supreme Court. Our role is to apply the law as it exists. *Hatchard v. Westinghouse Broadcasting Company*, 350 Pa.Super. 1, 504 A.2d 211, 223 (1986), *rev'd on other grounds*, 516 Pa. 184, 532 A.2d 346 (1987). However, we see no indication that the Prudent Investor Rule is antithetical to the holding in *Gouley*.

¶ 36 The Objectors did not allege that Trustee committed actual fraud. Nor did they present the trial court with a coherent charge of willful misconduct. Thus, the question to be resolved is whether Trustee's management of the Trust can properly be characterized as "gross negligence." Unfortunately, the Declaration of Trust itself does not define this term. The interpretation of a contract is a question of law; therefore, our standard of review is plenary. *Profit Wize Marketing v. Wiest,* 812 A.2d 1270, 1274 (Pa.Super.2002). When the terms in a contract are not defined, we construe the words in accordance with their natural, plain, and ordinary meaning. *Id.* It is well-settled that the terms of a contract must be construed consistently with the law as interpreted and defined by the courts. *AK Steel Corporation v. Viacom, Inc.,* 835 A.2d 820, 823 (Pa.Super.2003).

¶ 37 It is clear that "gross negligence" is not the same thing as "fraud" or "lack of good faith." *Demharter v. First Federal Savings & Loan Association of Pittsburgh,* 412 Pa. 142, 153 n. 6, 194 A.2d 214, 219 n. 6 (1963). However, the task of defining what "gross negligence" is, as opposed to what it is not, has posed a longstanding problem for our courts. As the United States Supreme Court explained over one hundred years ago, the term has no precise and easily discernible meaning ascertainable from the case law because it is a "relative term." *Milwaukee and St. Paul Railway Company v. Arms,* 91 U.S. 489, 495, 23 L.Ed. 374 (1875). In essence, "gross negligence" is merely "negligence with a vituperative epithet." *Id.* at 495. "Confusion has arisen from regarding 'negligence' as a positive instead of a negative word." *Id.* at 494. In actuality, it is "the absence of such care as it was the duty of the defendant to use." *Id.* at 494–95. "Gross" is a word of descrip-

tion and not of definition. *Id.* at 495. The term "is doubtless to be understood as meaning a greater want of care than is implied by the term 'ordinary negligence'." *Id.* at 495. But it introduces a source of confusion to use the expression "gross negligence" rather than its equivalent: the absence of due care and the skill that was necessary under the circumstances. *Id.*

¶ 38 It has been observed aptly that analyzing the numerous Pennsylvania cases dealing with the definition of "gross negligence" is "more similar to looking at multiple pellets from a shotgun as compared to a single bullet from a rifle." *Royal Indemnity Company v. Security Guards, Inc.,* 255 F.Supp.2d 497, 505 (E.D.Pa.2003). Pennsylvania law has employed the concept since the early days of the Commonwealth. *See, e.g., Eddowes v. Niell,* 4 Dall. 133, 1 L.Ed. 772 (1793) (applying "gross negligence" standard regarding surety bonds); *Hood's Executors v. Nesbit,* 2 Dall. 137, 1 L.Ed. 321 (1792) (applying same to allegations of barratry); *Purviance v. Angus,* 1 Dall. 180, 1 L.Ed. 90 (1786) (applying *crassa negligentia* (gross neglect or the absence of ordinary care) in an admiralty suit). Nevertheless, although the term has been employed frequently in Pennsylvania case law, it has not been well defined in the civil context. The difficulty of establishing an appropriate meaning for the phrase stems from the derivation of the concept itself. *See Ferrick Excavating and Grading Company v. Senger Trucking Company,* 506 Pa. 181, 194 n. 2, 484 A.2d 744, 750 n. 2 (1984) (discussing the historical derivation of graded degrees of negligence and graded duties of care).

¶ 39 Most jurisdictions, including Pennsylvania, have rejected the idea that there can be "degrees of negligence" (*i.e.,* slight, ordinary, gross). William L. Prosser, ***Prosser and Keeton on The Law of Torts***

§ 34 (W. Page Keeton, gen. ed., 5th ed.1988); *Ferrick Excavating,* 506 Pa. at 191, 484 A.2d at 749 (Some jurisdictions maintain such distinctions in bailment cases or under automobile guest statutes. Black's Law Dictionary 931 (5th ed.1979)). *See also* Black's Law Dictionary 1062–63 (8th ed.2004) (discussing gradations in duty of care and types of negligence). While Pennsylvania law does not recognize different degrees of negligence, it does apply differing "standards of care." *Ferrick Excavating, supra.* At first blush, the distinction may appear to be a quibble of interest only to historians. However, the difficulty is that while the term has been invoked with great frequency, Pennsylvania courts have struggled to provide a workable definition for "gross negligence" when faced with the need to apply the concept. In many instances, courts appear to have been willing to proceed in the absence of any definition whatsoever.

¶ 40 Pennsylvania criminal law equates "gross negligence" with "recklessness," at least for the purpose of determining the *mens rea* element of manslaughter. *Commonwealth v. Huggins,* 575 Pa. 395, 405, 836 A.2d 862, 867–68 (2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2073, 158 L.Ed.2d 624 (2004). However, the *Huggins* Court clearly indicated that "gross negligence" in the context of criminal negligence is not the same thing as "gross negligence" in tort. *Id.* at 404, 836 A.2d at 867. At least in the context of the Mental Health Procedures Act (MHPA),[13] this Court has held clearly and explicitly that "gross negligence" denotes "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference." *Bloom v. DuBois Regional Medical Center,* 409 Pa.Super. 83, 597 A.2d 671, 679

(1991). Before specific conduct can be deemed to be "gross negligence" for the purposes of the MHPA, a defendant's behavior "must be flagrant, grossly deviating from the ordinary standard of care." *Id.* Our Supreme Court subsequently adopted the *Bloom* definition of "gross negligence" for the purposes of the MHPA. *Albright v. Abington Memorial Hospital,* 548 Pa. 268, 278, 696 A.2d 1159, 1164 (1997). In *F.D.P. v. Ferrara,* 804 A.2d 1221 (Pa.Super.2002), we applied the *Bloom* definition of "gross negligence" (as adopted by *Albright* ) to a case brought pursuant to the Mental Health and Mental Retardation Act of 1966 (MHMR).[14]

¶ 41 In *Ratti v. Wheeling Pittsburgh Steel Corporation,* 758 A.2d 695 (Pa.Super.2000), *appeal denied,* 567 Pa. 715, 785 A.2d 90 (2001), we indicated that when courts have considered the concept of "gross negligence" in various civil contexts, they have concluded uniformly that there is a substantive difference between "ordinary negligence" and "gross negligence." *Id.* at 703. "The general consensus finds [that] gross negligence constitutes conduct more egregious than ordinary negligence but does not rise to the level of intentional indifference to the consequences of one's acts." *Id.* at 704 (relying in part on bailment cases and in part on the definition of "gross negligence" as applied to the MHPA). Gross negligence may be deemed to be a lack of slight diligence or care comprising a conscious, voluntary act or omission in "reckless disregard" of a legal duty and the consequences to another party. *Id.* at 704–05 (citing Black's Law Dictionary 1057 (7th ed.1999)). We shall analyze the facts of record, in light of the generalized defi-

---

**13.** 50 P.S. 7101–7503.

**14.** 50 P.S. § 4101–4704.

nition of "gross negligence" articulated in *Ratti*.

¶ 42 At the deposition conducted on August 16, 2002, Oehmler was shown a pamphlet (entered as Deposition Exhibit 5) which was distributed by Sky Trust via racks placed at various Sky Financial facilities. Deposition, 8/16/02, at 45. The pamphlet was entered into evidence and states that Sky Trust places investments under "the continual supervision of our investment officers." *Id.* Oehmler explained that "continual supervision" means "periodic supervision." *Id.* at 47. The pamphlet also states that the people who will exercise supervision over living trusts placed in the care of Sky Trust are "capable specialists" and that the "capable specialists will recommend desirable changes in keeping with the **trust maker's personal investment goals.**" *Id.* (emphasis added). When queried, Oehmler agreed that he was "one of Sky Trust's capable specialists." *Id.* at 48.

¶ 43 Sky Trust did not procure its position as Trustee by representing to Grantor that it had greater skill than a man of ordinary prudence. The trust instrument originally named Century National as trustee and Sky Trust is merely the successor-in-interest to Century National. Nevertheless, the evidence is clear that Sky Trust subsequently held itself out as having special expertise in managing living trusts. Furthermore, Sky Trust's own advertising pamphlet indicates that its "capable specialists" would recommend changes for the purpose of maintaining the "personal investment goals" of the person who made the trust.

█ ¶ 44 The trial court concluded that Sky Trust, through its own advertising, imposed upon itself a duty to make investment decisions in a manner consonant with the standard applicable to an expert possessing superior skill. Trial Court Opin-

ion, 3/17/03, at 12. We agree. A corporate trustee is required "to exercise a skill greater than that of an ordinary man" and its manner of handling investments must be evaluated "in light of such superior skill." *See Estate of Killey,* 457 Pa. at 477, 326 A.2d at 375 (citing Restatement (Second) of Trusts § 174 and explicating skill level to be exercised when a trustee holds itself out as being possessed of greater knowledge and skill than that of an average man); and *Estate of Scharlach,* 809 A.2d at 384 (holding that a financial institution that specialized in fiduciary accounts is subject to a higher duty of care than is an ordinary person). As noted above, the Prudent Investor Rule does not alter the common law duty imposed on a fiduciary, but rather codifies the case law under the following rubric: "A fiduciary who represents that he has special investment skills shall exercise those skills." 20 Pa.C.S.A. § 7212. Section 7212 applies to the present case, because it applies to all actions taken by a trustee after the effective date, December 25, 1999.

█ ¶ 45 When a trust instrument is explicit as to the duty owed by the trustee, the terms of the trust instrument govern. *Estate of Niessen,* 489 Pa. at 139, 413 A.2d at 1052. Nevertheless, the language of section 7212 contains no exception for trust instruments that establish a "gross negligence" standard for the trustee. Rather, it requires a trustee to exercise the skill level he or she actually possesses. Thus, we must evaluate Trustee's conduct in light of the special skill it (and Oehmler) claimed to possess and we must ascertain whether Trustee's actions were grossly negligent when viewed in that light. We agree with the trial court that Trustee's actions constitute "gross negligence" no matter what level of skill Trustee ought to have exercised.

¶ 46 Trustee is correct in stating that, under the terms of the Declaration of Trust, it was not required to consult with Grantor, the Life Tenant or the Remaindermen concerning the sale or retention of specific assets. But our legal standard still requires us to determine whether Trustee exercised its power in this regard prudently or whether it committed either negligence or gross negligence in developing and executing its investment strategy. A clear distinction must be made between the power to retain, acquire or sell assets and the duty to ascertain whether the factual circumstances surrounding a specific trust have changed in a manner that affects the validity and prudence of a particular investment strategy.

¶ 47 The question of whether a trustee acted prudently cannot be answered in the abstract. An investment decision that might be prudent for one client may be imprudent for another, and could constitute gross negligence for a third client if the circumstances surrounding that trust are dramatically different from those of the other clients. Our law is well-settled that evaluating the propriety of a trustee's course of conduct requires consideration of the terms of the trust, the nature of the power accorded to the trustee and all the circumstances surrounding the trust. *Briggs' Estate*, 27 A.2d at 433. Experts agree that diversification of assets is a wise approach to trust management. Our legislature has adopted that conclusion as the public policy of Pennsylvania. 20 Pa.C.S.A. § 7204. Nevertheless, the mode and methodology of a diversification strategy may be prudent, negligent, or grossly negligent, depending on the investments actually selected, the timing of asset sales or acquisitions, the goals of the trustor, and the factual circumstances surrounding the particular trust implicated by a specific diversification program.

¶ 48 We do not evaluate a trustee's management of trust assets with 20/20 hindsight, nor do we require a trustee to be clairvoyant in selecting only optimal investments that always appreciate in value and never decline in worth. But even a trustee who must act with gross negligence before he can be held accountable, must be able to explain how an investment strategy was developed for a specific trust and why that strategy was prudent under existing circumstances. *See Briggs' Estate*, 27 A.2d at 433 (defining parameters for judicial evaluation of trustee's exercise of power). In other words, a trustee must be able to demonstrate that the chosen investment strategy was not based on a conscious, voluntary act or omission taken in reckless disregard of the consequences to the trust. *See Ratti*, 758 A.2d at 704–05 (defining gross negligence). We cannot agree with Trustee that the "absolute discretion" to purchase, sell or retain trust assets conferred by the Declaration of Trust entitled Trustee to ignore the factual circumstances surrounding the Scheidmantel Trust. Nor can we agree that Trustee had no duty to keep abreast of changes in those factual circumstances by making inquiry with reasonable frequency and at reasonable intervals concerning the needs of the Life Tenant. In particular, Trustee was unjustified in altering the horizon and investment objective for the Scheidmantel Trust without ascertaining the current circumstances of the Life Tenant.

¶ 49 In *Estate of Pew*, 440 Pa.Super. 195, 655 A.2d 521 (1994), this Court articulated the legal standard applicable to diversification of trust principal prior to the enactment of section 7204 of the PEF Code. As we explained in *Pew*, a trustee or successor trustee had no obligation under Pennsylvania law to diversify the principal of a trust by selling shares in a large

block of common stock and making another investment. *Id.*, 655 A.2d at 543. The trustee was not required to diversify as long as the trust principal, as funded by the settlor, was fulfilling both the income beneficiary's interest in producing income and the remaindermen's interest in capital growth. *Id.* Retention of stock which the trustee received from the settlor was not, without more, deemed to constitute negligence. *Id.* at 544. The propriety of retaining stocks was considered especially justifiable when the stocks produced a high rate of return for the trust over an extended period. *Id.*

¶ 50 The Prudent Investor Rule itself contains the following statement:

The rules of this chapter are standards of conduct and not of outcome or performance. Compliance with the rules of this chapter shall be determined in light of the facts and circumstances prevailing at the time of the fiduciary's decision or action and not by hindsight. A fiduciary is not liable to the extent the fiduciary acted in substantial compliance with the rules of this chapter or in reasonable reliance on the terms and provisions of the governing instrument. A fiduciary's investment and management decisions respecting individual assets shall be considered in the context of the trust portfolio as a whole and as part of an overall investment strategy, and not in isolation. No specific investment or course of action, taken alone, shall be considered inherently prudent or imprudent.

20 Pa.C.S.A. § 7213.

¶ 51 Whether a trustee has adhered to the above standards cannot be evaluated in a vacuum. Deciding whether Trustee acted properly in this particular case necessarily depends on whether both the decision to diversify and the method of diversification chosen were consistent with Grantor's purpose in establishing the Trust. "A trust is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises out of the result of a manifestation of an intention to create it." *In re Trust of Hirt*, 832 A.2d 438, 447–48 (Pa.Super.2003) (citing Restatement (Second) of Trusts, § 2). When interpreting the provisions of a trust, "the polestar in every trust is the settlor's intent and that intent must prevail." *Id.* at 448. The rules for determining a settlor's intent are the same for a trust as for a will. *Id.* The settlor's intent must be ascertained from a consideration of (a) all the language contained in the four corners of the instrument and (b) the distribution scheme and (c) the circumstances surrounding the testator or settlor at the time the will was made or the trust was created and (d) "the existing facts." *Id.*

¶ 52 Technical rules or canons of construction should be employed only if the language of the instrument is ambiguous or conflicting or the intent of the settlor or testator is for any reason uncertain. *Id.* When provisions of a trust instrument conflict, "they should be read in such a fashion as to give effect to both and/or fulfill the intent of the settlor." *Id.* Nevertheless, "courts cannot rewrite a settlor's deed of trust or distort his language or the language of a statute in order to attain what is believed to be beneficial or wise or even what it is believed that the settlor would or should have provided if he [or she] possessed a knowledge of all presently existing circumstances." *Id.* To ascertain the actual intent of the settlor or testator, a court "must place itself in his [or her] armchair and consider not only the language and scheme of the instrument but also the facts and circumstances with which [the settlor] was surrounded[.]"

*Trust Estate of Pew,* 411 Pa. at 107, 191 A.2d at 405. These "surrounding facts and circumstances" include the condition of the family of the testator or settlor, the natural objects of his or her bounty, and the amount and character of the property implicated by the trust or will. *Id.*

¶ 53 In this case, the trust instrument does not contain a separate article or a specific clause explicitly explaining the Grantor's purpose in creating the Scheidmantel Trust. However, the Declaration of Trust does authorize Trustee to hold and manage the trust corpus in the event of Grantor's incapacity, and to make payments for the health, education, maintenance or support of both the Grantor and the Life Tenant. Declaration of Trust, 7/29/98, at 2, Article Second. The trust instrument does not name any other income beneficiaries or successor income beneficiaries.

¶ 54 Upon Grantor's demise, the trust instrument requires the trust corpus to be apportioned between a credit shelter trust and a separate marital deduction trust. *Id.,* at 2–3, Articles Third and Fourth. It directs the Trustee to pay the net income of both the credit shelter trust and the marital deduction trust to the Life Tenant, or to expend it on his behalf. *Id.,* at 3–4, Articles Third and Fourth. It also authorizes Trustee to pay trust principal from both the credit shelter trust and the marital deduction trust to or on behalf of the Life Tenant for his health, education, maintenance or support. *Id.* However, the trust instrument does not authorize income payments to any beneficiary other than Life Tenant from either the credit shelter trust or the marital deduction trust.

¶ 55 It is clear that Grantor had three purposes when creating the Scheidmantel Trust: assuring adequate income for herself and for her spouse, estate tax planning, and passing on any remaining assets to her descendants. However, a fair and careful reading of the terms of the instrument of trust indicates that the Grantor's **primary** purposes were two-fold: providing an adequate income to Grantor and to the Life Tenant during their respective lifetimes and planning for estate taxes. The Grantor's issue had no income rights. Furthermore, the trust corpus, including any income unused by Grantor or by Life Tenant, was to be paid to the Remaindermen (or to the Life Tenant's heirs and legatees) only after the death of both the Grantor and the Life Tenant. Thus, the third purpose of the Scheidmantel Trust (passing on the Grantor's property to her issue) clearly was subordinated to providing an adequate income to the Grantor and the Life Tenant and to estate tax planning.

¶ 56 A trustee always must balance the income rights of life tenants against the rights of remaindermen. *Estate of Pew,* 655 A.2d at 542. In seeking this balance, a trustee's primary duty is to preserve the assets of the trust and to ensure the safety of the trust principal. *Id.* Neither retention of assets nor diversification of assets is *per se* improvident. *Id.* However, when, as in the present case, a settlor has vested a fiduciary with the absolute discretion to retain or to divest assets, the fiduciary is not thereby excused from the duty to make its decision "prudently" and in a manner in keeping with the duty of preserving trust assets. *Id.*

¶ 57 When the first portfolio review was performed in March of 1999, the portfolio manager indicated that his understanding of the investment goal of the Scheidmantel Trust was "safety and income." *See* N.T., 11/21/02, at 13–14 (discussing inception of Scheidmantel Trust). The original horizon of the Scheidmantel Trust was set at three to seven years, in consideration of the facts

and surrounding circumstances known at the time the first portfolio review was conducted. Oehmler Deposition, 8/16/02, at 31–32, 38. The record indicates that the Life Tenant moved to a nursing home in August of 1999 because he had become incapable of taking care of himself. N.T., 11/21/02, at 32–33. During the six month period before the death of the Life Tenant in December of 2000, his physical and mental health were deteriorating rapidly. *Id.* at 33.

¶ 58 The record is clear that Oehmler never consulted with the Life Tenant or the Remaindermen after taking over as portfolio manager. Nevertheless, without even attempting to learn whether the Life Tenant's circumstances and life expectancy had improved or deteriorated, Oehmler altered the investment goal of the Scheidmantel Trust to "balanced" and increased the horizon from "three to seven years" to "seven to ten years." *Id.* at 10–11, 27, 44. It is clear that Oehmler had no factual basis for making these changes and that he never made any attempt to ascertain the Life Tenant's physical condition, his prognosis or his current income needs.

¶ 59 In deposition testimony, Oehmler could provide no reason for changing the investment goal and the horizon of the Scheidmantel Trust. Nor could he supply any concrete basis for deciding that diversification was necessary in this particular case to preserve the safety of the specific assets held by the Trust, viewed in light of the particular circumstances surrounding the Trust. At the hearing conducted on November 21, 2002, Oehmler indicated that diversification was a good idea, as a general matter, if a particular trust is too heavily concentrated in one asset. N.T., 11/21/02, at 41–42. However, Oehmler previously had conceded there was no reason to think that the SKYF stock was unsound or it was likely to suffer a substantial decline in value in the near future. *Id.* at 25–26. Furthermore, when he was deposed in August of 2002, Oehmler demonstrated that he considered SKYF stock to be a prudent investment because he stated that he personally owned (and continued to retain) SKYF stock and that he checked the stock price "probably every day." N.T., 8/16/02, at 11.[15]

¶ 60 The above facts indicate that Oehmler determined that diversification of assets was a prudent course of action, as a general matter, without reference to the specific circumstances pertaining to the Scheidmantel Trust. That Oehmler had no reason to believe SKYF stock itself was a bad or imprudent investment is demonstrated by the fact that he owned SKYF stock himself. He was aware of the value of that stock because he checked it frequently. We do not disagree with Trustee that diversification generally is a good idea. However, diversification cannot become a goal in and of itself. Rather, diversification is a tool that can provide the means to effectuate a settlor's goals for a trust, if used properly and prudently with due regard to the specific facts and circumstances that exist in a particular case.

---

**15.** Sky Financial authorized a repurchase plan through which the company intended to repurchase up to 3.5 million shares of SKYF common stock. The action was taken to provide shares to pay future stock dividends and for use in stock option programs for its employees. N.T., 8/16/02, Oehmler Deposition Exhibit 8, Sky Financial Press Release, 10/21/99. No evidence of record indicates whether any of the SKYF stock formerly held by the Scheidmantel Trust was resold to be held as treasury stock or to be used for the above purposes. Nor does the record elucidate whether Oehmler's SKYF stock was obtained through a stock option program or through an unrelated personal purchase. Thus, nothing of record conclusively establishes that any unauthorized self-dealing occurred in this case.

¶ 61 In the absence of controlling precedent, and particularly in the absence of any such requirement in the statutory law, there is no authority mandating that trust investments, otherwise legal and entirely proper under all the recognized standards, are necessarily improvident for any claimed lack of proper diversification. *Estate of Pew*, 655 A.2d at 542 (quoting *Estate of Knipp*, 489 Pa. at 513–14, 414 A.2d at 1009). The converse of this principal also is true: in the absence of a legal duty to retain specific assets, diversification in any given case cannot automatically be deemed either unlawful or imprudent. Whether the method and mode chosen for diversifying the assets of any given trust is (or was) "prudent" or "imprudent" necessarily must depend on the settlor's goal or goals in creating the trust and the factual circumstances surrounding the trust at the time a diversification program is initiated.

¶ 62 We recognize that diversification is required by the PEF Code for those trusts to which section 7204 applies. Although section 7204 itself does not expressly require that a diversification strategy must be prudent under the circumstances surrounding a particular trust, it would be irrational to conclude that the Legislature intended to create an excuse for imprudent or negligent conduct by a trustee. When a fiduciary is vested with the absolute discretion to retain assets or to diversify, the fiduciary is not thereby excused from the duty of exercising that discretion "prudently." *Estate of Pew*, 655 A.2d at 542.

¶ 63 Here, the primary asset of the Scheidmantel Trust consisted of shares of common stock which consistently paid high dividends. As noted above, the Life Tenant had the right to require a sale by the Trustee of any assets in the marital deduction trust not producing a reasonable income. However, there is no evidence indicating that the Life Tenant considered his income to be inadequate, and no evidence that he ever directed Trustee to liquidate any of the SKYF common stock in favor of acquiring a different type of asset.

¶ 64 Under Oehmler's aegis, Trustee consistently liquidated SKYF stock without considering various factors that a "capable specialist" ought to have taken into account when acting as a fiduciary and prudently managing his client's business affairs. The sell events for the SKYF stock and the purchase of the new assets were effectuated without regard to any of the following factors: (1) the immediate loss of income to the Trust caused by the purchase of investments yielding lower income rates than the SKYF stock; (2) the diminution in actual value of the Trust assets through the purchase of costly assets with long-term capital gain potential that had no likelihood of realization because of the Life Tenant's poor health; (3) the decision to purchase additional institutional mutual funds well after the Life Tenant's death and at the end of a calendar year; (4) the cost to the Trust of management fees, such as 12b–1 fees, levied by the mutual funds themselves which do not pertain to the ownership of common stock;[16] and (5) the timing of the sales and

---

16. Mutual fund managers do not work for free. However, the existence of the management fees charged by a mutual fund may not be immediately apparent when inspecting an account filed by a trustee because such fees are not necessarily applied to the trust assets as a separately billed cost. Mutual funds commonly assess their management fees against the value of each share. This practice need not result in a specific entry in a trust account representing the cost of the mutual fund management fees. Rather, the trust account simply would show a lesser book value for the mutual fund shares once the fees have been collected by the fund's managers. There is nothing fraudulent about this practice but it

purchases with regard to the SKYF ex-dividend dates and end-of-year fees charged by mutual funds. We agree with the trial court that this course of conduct cannot be considered "prudent" and that, in fact, it constituted "gross negligence" under the circumstances surrounding the Scheidmantel Trust.

¶ 65 The Objectors do not claim that the investments chosen by Trustee were fundamentally unsound, in and of themselves. However, they do argue that the specific diversification program chosen by Trustee, in particular the timing of sales and purchases, was predicated on generic assumptions regarding what constitutes a "good investment" rather than on current factual information regarding the Life Tenant and his needs and the nature of the investments themselves. The Objectors also contend that the diversification program chosen in this case comprised voluntary acts or omissions committed in "reckless disregard" of Trustee's absolute legal duty of faith to ascertain the specific circumstances surrounding the Scheidmantel Trust on a reasonable basis and with reasonable frequency.

▆▆▆▆ ¶ 66 The judgment of a fiduciary acting in good faith on considered circumstances has controlling effect as to the timing of the sale of a particular investment. *In re Brown's Estate*, 287 Pa. 499, 503, 135 A. 112, 113 (1926) (cited with approval by *In re Flagg's Estate*, 365 Pa. 82, 91, 73 A.2d 411, 416 (1950)). However, the trustee's action must represent an actual and honest exercise of judgment predicated on a genuine consideration of existing conditions. *Id.* In determining what constitutes sound business judgment, "too much stress must not be laid on retrospection." *Id.* Hindsight cannot be "the

must be recognized that it exists as a cost of

sole judge"; however it may be "useful." *Id.* at 503, 135 A. at 113–14.

¶ 67 We have already explained that this is not a case in which Trustee actually exercised its discretion and determined that diversification was necessary in the short term to protect the assets and to preserve Life Tenant's income stream. The Trustee made no such determination. Rather, as the trial court concluded, this is a case in which Trustee applied a hypothetically "good" strategy under specific circumstances and in a manner that made the particular diversification program selected a "grossly negligent" course of conduct. There was no short-term danger to the safety of the trust's assets requiring immediate sale of the SKYF stock to protect the trust principal. Furthermore, it is clear that Trustee had no factual basis for expanding the Trust's horizon because the Life Tenant's health indicated that the total liquidation of the Trust would be required in the near term. Simply put, there were no reasonable prospects that the Trust could continue in existence long enough to experience capital growth from the chosen diversification strategy and it was gross negligence to sell safe and high performing assets in the implausible hope that a long-term capital gain could be realized. Under these circumstances, we cannot agree with Trustee that the trial court committed either an error of law or an abuse of discretion in determining that a surcharge ought to be imposed in this case.

▆▆▆▆ ¶ 68 The next question is whether the trial court used a proper and reasonable method to calculate the amount of the surcharge to be imposed. A surcharge is the equitable penalty imposed when a trustee fails to exercise the requisite standard of care and the trust suffers

owning shares in a mutual fund.

thereby. *Estate of Scharlach,* 809 A.2d at 384. The purpose of a surcharge is to compensate beneficiaries for the loss caused by the fiduciary's want of the appropriate level of care. *Trust of Munro v. Commonwealth National Bank,* 373 Pa.Super. 448, 541 A.2d 756, 758 (1988). As we stated in *Trust of Munro,* when determining the proper surcharge to be imposed, we are guided by the Restatement (Second) of Trusts. *Id.* The duty of trust which may not be breached is the duty of care required of a trustee in a given case. *Estate of Scharlach,* 809 A.2d at 384.

> Restatement § 204 provides that a trustee is not liable for a loss in value of the trust property or for a failure to make a profit that does not result from a breach of trust. Conversely, Restatement § 205 provides, "If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." Comment (a) explains that in choosing among these three remedies, the beneficiary has the option of pursuing the remedy that will place him

in the position in which he would have been if the trustee had not committed the breach.

*Trust of Munro,* 541 A.2d at 758.

■■■■ ¶ 69 Clearly, a trustee cannot be surcharged for a breach of the relevant duty of care unless the breach caused an actual loss to the trust. *Estate of Pew,* 655 A.2d at 543. However, that loss may be in the form of lost interest or unrealized capital gain as well as direct capital loss. *Scharlach,* 809 A.2d at 386. The trial court may grant a surcharge for the purpose of providing the beneficiaries with the unrealized gain to the value of principal assets of a trust that was lost because of a trustee's failure to fulfill its duty of care. *Id.* Furthermore, "[l]ost income is just as much unrealized gain as unrealized principal growth." *Id. See* Restatement (Second) of Trusts § 205, comment a (explaining alternative remedies available to trust beneficiaries).[17]

■■■■ ¶ 70 One who seeks to surcharge the trustee for a breach of trust must bear the burden of proving the particulars of the trustee's alleged wrongful conduct. *Estate of Pew,* 655 A.2d at 543. "The propriety of an investment by a trustee must be judged as it appeared at the

**17.** We are not convinced by Trustee's argument that Pennsylvania law only permits recovery of lost profits and lost interest if a trustee has failed to follow a "specified" or court-imposed investment plan. *Scharlach* and the other Pennsylvania cases cited by Trustee contain no such requirement. These decisions merely reiterate the well settled rule that a surcharge cannot be imposed unless a trust has suffered "actual loss." *Estate of Pew,* 655 A.2d at 543. Furthermore, contrary to Trustee's interpretation, sections 205 and 211 of the Restatement (Second) of Trusts impose no universal requirement that a "specified" or court-imposed investment plan must exist before lost profits and lost income are recoverable. The fact that *Scharlach* implicated such an investment plan is not dis-

positive because its ruling stems from negligence by a trustee and was not limited solely to negligence pertaining to a court-ordered investment plan. Furthermore, although we are aware of the federal ruling to the contrary in *Pitts v. First Union National Bank,* 262 F.Supp.2d 593 (D.Md.2003) (interpreting Pennsylvania law), we are not bound to apply that ruling to the present appeal. Federal court decisions do not control the determinations of the Superior Court. *Werner v. Plater-Zyberk,* 799 A.2d 776, 782 (Pa.Super.2002), *appeal denied,* 569 Pa. 722, 806 A.2d 862 (2002). "[A]bsent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved." *Id.*

time it was made and not as viewed in the light of subsequent events." *Id.* Hindsight is not the test of liability for a surcharge. *Id.,* 655 A.2d at 544. Nevertheless, a fiduciary who has negligently caused a loss to an estate may properly be surcharged for the amount of such loss. *In re Estate of Lychos,* 323 Pa.Super. 74, 470 A.2d 136, 141 (1983). Once a beneficiary has proved that the trustee committed a breach of duty and that a related loss occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach of that duty. *Estate of Lychos,* 470 A.2d at 142.

¶ 71 When a fiduciary is deemed legally liable for the diminution in the value of a trust's assets, the trustee's liability is not the difference between the appraised value and the amount actually obtained upon the sale of the asset. *Brown's Estate,* 287 Pa. at 504, 135 A. at 114. Rather, it is the difference between what the asset would have brought, had the trustee exercised an appropriate level of care, and the amount actually received upon sale. *Id.* Furthermore, the trustee is responsible to reimburse identifiable loss of income to the trust as well as identifiable lost profits and unwarranted expenses. *See, e.g., Scharlach,* 809 A.2d at 386.

¶ 72 In this case, the trial court imposed a surcharge recompensing the Remaindermen for lost profits in the form of lost stock dividends and lost capital gain on the shares sold to purchase the mutual funds. The trial court also surcharged Trustee in an amount commensurate with lost interest, considering all sources. The trial court did not, however, factor the value of the mutual funds purchased by the Trustee into its calculation of the Trust's lost capital value. Trustee is entitled to an offset for any increase in the value attributable to the mutual funds. We therefore remand the matter so that Trustee may present evidence concerning the value of the mutual funds to the Remaindermen at the time the Trust assets were disbursed. The Objectors must be permitted to present rebuttal evidence concerning any loss experienced by the Trust due to costs attributable to holding the mutual fund shares.

¶ 73 Finally, Trustee contends that the trial court erred in ruling that Trustee failed to act in an expeditious manner to wind up the trust and distribute the trust estate to the Beneficiaries. The trial court found that "[w]ith due diligence, such proceedings could readily have been accomplished in the year 2001." Trial Court Opinion, 3/17/03, at 12. We can grant no relief on this claim. First, Trustee concedes that the trial court imposed no sanction against Trustee because of this finding. Trustee's Brief at 28. Second, the Scheidmantel Trust contained no stock in closely held corporations or other property with a limited market that would have been difficult to sell. Trustee has failed to explain why it took approximately eighteen months to liquidate assets comprised entirely of mutual fund shares, cash, and shares of publicly traded common stock that could be distributed in kind. We find no basis in the record on which we could conclude that the trial court's ruling in this regard constitutes either an abuse of discretion or an error of law.

¶ 74 Order affirmed in part and reversed in part; remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.