J-A01035-23

2023 PA Super 186

| IN RE: SLETTEN FAMILY TRUST | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: KATHRYN SLETTEN, IKOR, TRUSTEES, ACCOUNTANTS | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 408 EDA 2022 |

Appeal from the Order Entered December 27, 2021
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2017-X2838

| IN RE: SLETTEN FAMILY TRUST | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: CHAD SLETTEN, CHRISTOPHER SLETTEN, DANIEL SLETTEN, JOSEPH SLETTEN, KELLY DAHL | : | |
| | : | |
| | : | |
| | : | No. 507 EDA 2022 |

Appeal from the Order Entered December 27, 2021
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2017-X2838

BEFORE:  LAZARUS, J., NICHOLS, J., and McCAFFERY, J.

OPINON BY LAZARUS, J.:                    **FILED SEPTEMBER 27, 2023**

Before this Court are cross-appeals from the adjudication entered in the Court of Common Pleas of Montgomery County, Orphans' Court Division, granting certain objections filed by Chad Sletten, Christopher Sletten, Danielle Sletten, Joseph Sletten, and Kelly Dahl (collectively, Sletten Children) to the

Second Account[1] of the Sletten Family Trust (Trust) filed by Kathryn Sletten (Kathryn) and IKOR (collectively, Co-Trustees), and ultimately surcharging the Co-Trustees and denying their request for attorneys' fees. Sletten Children cross appeal the Orphans' Court's determination that a mortgage was a valid debt of the trust, and request that this Court award sanctions in the form of attorneys' fees. Upon review, we affirm the court's substantive rulings on the objections, deny the Sletten Children's request for sanctions, and remand solely for a recalculation of the amount remaining for distribution as discussed *infra*.

This matter concerns whether certain mortgage payments made by Kathryn and/or IKOR from Trust funds were valid Trust obligations. The Trust was created on May 15, 1998,[2] by Ida Marie Sletten (Settlor), following the death of her husband, Warren Sletten (Warren), solely for the purpose of holding property situated at 138 Summer Ridge Drive, Landsdale, PA ("Property"). Warren and Settlor purchased the Property in 1995 for $218,530.00 to serve as a home for their son, John Sletten, and his wife, Kathryn, co-trustee herein. N.T. Hearing on Objections, 11/15/21, at 18.

---

[1] Kathryn had also filed a First Accounting for the period between May 15, 1998 and August 1, 2017. Major differences in these accountings include an uncontested distribution of $80,000 to the Sletten Children, which was included in the second account, but omitted from the first account.

[2] This Court has previously determined that the May 15, 1998 trust is valid. ***Est. of: Sletten Family Trust, appeal of Dahl, K.***, 2289 EDA 2018 (Pa. Super. filed July 6, 2018) (unpublished memorandum decision).

When the Property was purchased, Warren and Settlor gifted the sum of $80,000.00 to John and Kathryn for the down payment and closing costs and executed a $160,000.00 promissory note and mortgage on the Property with Hatboro Federal Savings Bank ("Hatboro Mortgage") in their own names. John, acting in his capacity as agent for Warren under a power of attorney, executed both documents, along with Settlor. Kathryn testified that, at that time, there had been an unwritten "understanding" that John and Kathryn would be liable for the Hatboro Mortgage payments and that the Property would include a mother-in-law suite. *Id.* at 19, 21. Kathryn testified that John and Kathryn made payments on the Hatboro Mortgage starting in September of 1995 and that Warren and Settlor did not make mortgage payments. *Id.* at 25.

Following the creation of the Trust, on March 3, 1998, Settlor executed a deed transferring the Property to the Trust[3] and appointed John and Kathryn as co-trustees. Trustees were to be compensated for out-of-pocket expenses incurred but not for their services, and were granted the following powers: to sell, exchange, or otherwise dispose of the Property without court approval; to lease or grant options to buy for terms extending beyond the period of administration or duration of the trust; to make any division of distribution required hereunder in cash or in kind; and to serve without filing annual

---

[3] The deed does not state whether the Property was transferred "subject to" or "upon assignment" of the mortgage. Payment of the promissory note was not made an obligation of the Trust.

- 3 -

returns or reports and without giving bond. *See* Trust, at Article III (Appointment of Trustee); *id.* at Article VIII (Powers of Trustee).

The Trust also provided John with a beneficial life tenancy, permitting him to "occupy the [Property] as his primary residence and [providing that he] may exercise all rights in and to such real estate." *See id.* at Article III (Life Interest Beneficiaries). The Trust also provides that "under **no circumstances** shall [John] **mortgage**, encumber, alienate, or in any way transfer or assign his beneficial life interest or any rights therein tantamount to ownership in such real estate." *Id.* (emphasis added). If John were to either voluntarily or involuntarily (due to financial distress, court judgment, bankruptcy, or other financial reasons) vacate the Property for more than 30 days, his beneficial life interest in the Property was to terminate immediately. *Id.* John was also provided an interest in assets consisting of quarterly installments of income and principal distributions required and appropriate for John's health and well-being. *Id.*[4] The same tenancy interest was provided to Kathryn if she and John were married when John's interest terminated. *Id.*[5]

Upon termination of John and Kathryn's life interests, the Property was to be sold and trust assets distributed as follows: $80,000.00 to John's issue in equal shares per stirpes; and the remainder divided into two equal shares

---

[4] The Trust never held any liquid assets or made income or principal distributions to John.

[5] Kathryn is not named as a beneficiary of income or principal.

with one share divided equally among John's children and the other divided equally among Kathryn's children.[6] **See id.** at Article VI—Remainder Beneficiaries. The Trust was then to terminate.

Following Trust execution, John and Kathryn continued to make payments on the Hatboro Mortgage of $1,146.26 per month. N.T. Hearing on Objections, 11/15/21, at 24. On October 20, 1999, John and Kathryn, as co-trustees, executed a mortgage on the Property for $60,000.00 owed by Jasco, P.C.[7] to Tompkins/VIST Bank. On September 14, 2000, John and Kathryn, as co-trustees, executed another mortgage on the Property, for $40,000.00 owed by Jasco, P.C., to Tompkins/VIST Bank. On December 19, 2001, John and Kathryn again mortgaged the Property to secure a $100,000.00 line-of-credit at Tompkins/VIST bank (Tompkins/VIST LOC).

In 2009, Settlor died. Her will named John as executor and as a beneficiary. At the time of her death, the Hatboro Mortgage, in Settlor's name, had not been satisfied. On September 8, 2016, John died. **Id.** at 36. Kathryn selected IKOR to serve as co-trustee. Kathryn remained in the residence until on or about December 18, 2016, and her tenancy interest terminated 30 days later, on or about January 18, 2017.

---

[6] John and Kathryn each have children from previous relationships. They do not have any children together. John's children and Kathryn's children are, collectively, referred to as "Remaindermen."

[7] Jasco, P.C. is the name of John's accounting service. N.T. Hearing on Objections, 11/15/21, at 67 (Kathryn testifying "Jasco was one of [John's] many companies.").

On August 2, 2017, Kathryn filed a First Intermediate Accounting for the period between May 15, 1998 and August 1, 2017.[8] On October 5, 2017, the Property was sold for $462,500.00. At the time of closing, Kathryn and IKOR made the following payments from Trust principal: $88,536.13 on the Hatboro Mortgage, which included $7,332.35 in late charges accrued during John's life tenancy; and $27,017.29 on the Tompkins/VIST LOC. **See id.** at 47 (Kathryn testifying Hatboro Mortgage balance approximately $7,000.00 higher because "my husband made some late payments"). Kathryn also reimbursed herself $4,195.00 for payments she made on the Tompkins/VIST LOC after she terminated her life tenancy.

On August 27, 2018, Kathryn and IKOR filed a Second Intermediate Accounting, to which numerous objections were filed by the Sletten Children, including, *inter alia*, a request for surcharges relating to payments made from Trust funds that were not valid trust obligations and the reasonableness of Co-Trustee's request for attorneys' fees. **See** Objections, 9/27/2018.

On November 15-16, 2021, the Orphans' Court held a hearing at which Kathryn, Christopher Sletten, and Chad Sletten testified. Kathryn testified that she was unaware of any of Tompkins/VIST loans until after John's death. **Id.** at 71 (Kathryn testifying "I did not sign any additional mortgages over the

---

[8] Sletten Children filed objections to the First Intermediate Accounting. Therein, they objected to, *inter alia*, the validity of the May 15, 1998 Trust, any claimed attorney's fees or compensation requested by Kathryn, Kathryn's appointment of IKOR as co-trustee, and asserted that Kathryn had been mishandling the sale of the Property. **See** Objections, 8/17/17.

life of the [Hatboro Mortgage]"). Kathryn also testified that John had told her he forged her signature on a mortgage and after his death she called the bank to inquire into the loans. *Id.* at 70-71 (Kathryn testifying bank told her, "John used a portion of the [$100,000.00 line-of-credit, the Tomkins/VIST LOC] to pay off the prior two loans"). Kathryn testified that, rather than confronting the bank while John was living and endangering John's accounting business, their marriage, and their family, she continued making mortgage payments in order to protect the Trust. *Id.* at 75.[9]

Chad testified that Kathryn had initially denied the existence of the Trust and that he did not learn about the Trust until the beginning of January 2016. *Id.*, 11/16/21, at 13, 16. Christopher testified that Kathryn had told him, "[Kathryn] was going to spend every nickel of the trust . . . she was going to make sure there was nothing left." *Id.* at 11.

Following the hearing, the Orphans' Court ordered the following: (1) Kathryn surcharged for use of Trust funds to pay $7,332.35 of Hatboro Mortgage late fees; (2) Kathryn and IKOR jointly and severally surcharged for use of Trust funds to pay $27,017.29 of Tompkins/VIST LOC; (3) Kathryn surcharged for use of Trust funds to reimburse herself $4,195.00 for her payments toward Tompkins/VIST LOC she made after moving out of Property; and (4) distribution of the Trust balance, $379,044.22, as per Trust terms.

---

[9] Kathryn also testified that she and John purchased a home in Alabama in 2015. On cross-examination, Kathryn conceded that the plan was to sell the Property and use the proceeds to pay off the loan on the Alabama property. Kathryn also conceded that this violated the terms of the Trust. *Id.* at 87.

Both parties filed timely notices of appeal and court ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Co-Trustees raise the following questions for our review:

1. Did the Orphans['] Court err in surcharging Kathryn [] for the late payments on the Hatboro [] Mortgage when the [R]emaindermen were responsible for paying the principal on the mortgage, and Kathryn [] also was not the life tenant at the time late payments were made?

2. Did the Orphans['] Court err in surcharging Kathryn [] and IKOR for the payoff of the Tomkins/[VIST] mortgage when the Trust did not forbid the Trustees from taking out the mortgage, the life tenant had power of consumption, and the payments on the Hatboro [M]ortgage exceeded the payments on this second mortgage?

3. Did the Orphans['] Court misapply the law and abuse its discretion as a factfinder in calculating the final amount to be distributed after applying its surcharges by reaching a figure that is $151,509.26 too high?

4. Did the Orphans['] Court misapply the law and abuse its discretion in disallowing all fees of $70,000.36 payable to attorneys representing the Trustees in the course of trust administration by failing to follow a reasonableness standard and misallocating the burden of proof?

Appellant's Brief, at 6-7 (reordered).

The Sletten Children raise the following issues on cross-appeal:

1. Did the Orphans' Court err as a matter of law by allowing [T]rustees to treat the Hatboro [M]ortgage as a debt of the [T]rust instead of imposing a surcharge?

2. Should beneficiaries be awarded reasonable counsel fees against Trustees for filing a frivolous appeal when Trustees admitted the Tompkins/VIST Mortgage Loan was not a debt of the [T]rust?

Appellees'/Cross-Appellants' Brief, at 1.

- 8 -

This Court's review of an Orphans' Court's findings is deferential and will not be reversed absent an abuse of discretion. **Commonwealth v. Warden**, 2 A.3d 565, 571 (Pa. Super. 2010). "Our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence." **Id.**, quoting **In re State of Cherwinski**, 856 A.2d 165, 167 (Pa. Super. 2000).

Co-trustee's first two issues and the Sletten Children's first issue relate to surcharges.

> A surcharge is the equitable penalty imposed when a trustee fails to exercise the requisite standard of care and the trust suffers thereby. The purpose of a surcharge is to compensate beneficiaries for the loss caused by the fiduciary's want of the appropriate level of care. As we stated in **Trust of Munro** [**v. Commonwealth National Bank**, 541 A.2d 756 (Pa. Super. 1998),] when determining the proper surcharge to be imposed, we are guided by the Restatement (Second) of Trusts. []
>
>> Restatement § 204 provides that a trustee is not liable for a loss in value of the trust property or for a failure to make a profit that does not result from a breach of trust. Conversely, Restatement § 205 provides, "If the trustee commits a breach of trust, he is chargeable with[:] (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." Comment (a) explains that in choosing among these three remedies, the beneficiary has the option of pursuing the remedy that will place him in the position in which he would have been if the trustee had not committed the breach. [**Id.** at 758.]

*In re Scheidmantel*, 868 A.2d 464, 493 (Pa. Super. 2005). "We believe that, as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty." *Estate of Stetson*, 345 A.2d 679, 690 (Pa. 1975).

Co-Trustees first argue that the Orphans' Court erred in surcharging Kathryn for the payment of Hatboro Mortgage late fees in the amount of $7,332.35. *See* Appellant's Brief, at 51. Kathryn claims that, absent a written agreement, she and John as life tenants had no obligation to make payments on the Hatboro Mortgage principal, thus, on balance, the Trust did not suffer an actual loss when Kathryn, in her capacity as trustee, paid the Hatboro Mortgage late fees from Trust principal. *See id.* at 52, 54. In the alternative, Kathryn claims that she should not be responsible for John's late payments during **his** life tenancy. *Id.* at 55. Finally, Kathryn, citing to 20 Pa.C.S.A. §§ 7769(b) and 7780.6(a)(7), requests reimbursement for principal payments made on the Hatboro Mortgage, as well as the late fee payments due to their characterization as "trust expenses" for which trustees are entitled to reimbursement. *See id.* at 53, 54.

In surcharging Kathryn for late payments, the Court reasoned that "John and Kathryn [] were not simply living in the [P]roperty as life tenants, [but were also] co-trustees who **agreed** to pay the mortgage in exchange for the Trust purchasing the Property" and that the "[f]ail[ure] to make timely mortgage payments resulting in late fees and penalties being charged by the

bank is a breach of fiduciary duty because it resulted in a loss of value of the trust asset." ***Id.*** We agree.

Instantly, Kathryn conceded there was an "understanding" that **she and John**, in exchange for living at the Property, were to make monthly Hatboro Mortgage payments. N.T. Hearing on Objections, 11/15/21, at 19, 21. Kathryn testified that John and Kathryn's Hatboro Mortgage payments began on September 1, 1995, immediately after the note and mortgage were executed, and that Settlor and Warren **never** made mortgage payments. ***Id.*** at 25. Transfer of the Property to the Trust did not change this agreement as indicated, by John and Kathryn's continued mortgage payments subsequent to transfer.

In light of the foregoing, Kathryn's claim that she and John, as life tenants, had no obligation to the pay the Hatboro Mortgage is belied by the record.

Furthermore, Kathryn confuses her burden to prove a defense regarding surcharges. ***See In re Dentler Family Trust***, 873 A.2d 738, 746 (Pa. Super. 2005) (where objectors initially prove breach of fiduciary duty, trustee's burden is to show loss would have occurred in absence of breach of duty, rather than that trustee conduct increased trust funds generally). Here, Kathryn makes no claim that late fees would have accrued in the absence of a breach of fiduciary duty.

Additionally, Kathryn's attempt to create a distinction between John's life tenancy and her responsibilities as either life tenant or trustee is

unavailing. Kathryn, as co-trustee with John, had a fiduciary duty to ensure that the mortgage payments were timely made. *See In re Dentler Family Trust*, *supra*, at 746 (affirming trustees' late payment surcharge where trustees failed to timely pay trust's income and inheritance taxes). Moreover, although Kathryn's life tenancy could not have begun until John's terminated, the record shows that the aforementioned "understanding" regarding Hatboro Mortgage payments included **both** John and Kathryn. Further, John and Kathryn moved into the house **together** and made mortgage payments **together**. N.T. Hearing on Objections, 11/15/21, at 16 (Kathryn testifying she and John moved into Property in July 1995); *id.* at 27 (Kathryn testifying "**we** made all of the payments"); *id.* (Kathryn testifying "whenever [the payments] were started, **we** made them"). Accordingly, Kathryn's claim that she had no obligation in regard to these payments is specious.

Kathryn's request for reimbursement regarding Hatboro Mortgage payments pursuant to 20 Pa.C.S.A. §§ 7769(b) and 7780.6(a)(7) is also meritless. *See* 20 Pa.C.S.A. § 7769(b) (when trustee **advances money** for protection of trust, trustee entitled to lien on trust to secure reimbursement with reasonable interest); *see id.* at § 7780.6(a)(7) (trustee has lien on trust assets as against beneficiary when trustee **advances money** for protection of trust and for all expenses, losses and liability sustained in trust administration of holding or ownership of trust assets). Instantly, as discussed, *supra*, Kathryn and John were responsible for monthly mortgage payments and, thus, reimbursement is not warranted. Additionally, regarding

late fee payments, Kathryn satisfied the late fee payments **using trust principal**. Kathryn did not advance her own money. Thus, the aforementioned statutes provide her no relief.

In light of the foregoing, the Orphans' Court did not err in surcharging Kathryn for the late payments that accrued on the Hatboro Mortgage while she was trustee and her payment of the same using Trust proceeds.

The Sletten Children's first claim asserts that the entire remainder of the Hatboro Mortgage, $88,536.13, should be surcharged because John and Kathryn's agreement to pay the Hatboro Mortgage pre-dated the creation of the Trust. They also argue that because the note secured by a mortgage on the Property is in Settlor's name, it was never a debt of the Trust but, rather, a debt of Settlor's estate, which John should have paid in his capacity as executor of Settlor's will. *See* Sletten Childrens' Brief, at 28-31; *see* N.T. Hearing on Objections, 11/15/21, at 53 (Sletten Children's attorney proceeds under theory that because Hatboro Mortgage note was signed by Warren and Settlor, note should have been paid by Settlor's estate).

Upon review of the record, we find this claim waived. In the Sletten Children's First Objection, they conceded that the Hatboro Mortgage should be paid by the Trust. Sletten Children First Objection, 8/31/17, at ¶ 27 ("[t]he [Property] should be sold and proceeds distributed to the [beneficiaries] **following the payoff of the Hatboro [M]ortgage**."). In the Sletten Children's Second Objection, they only requested surcharges in the amount of the late fees. Sletten Children Second Objection, 9/27/18, at ¶ 3 ("The

balance at [Property] settlement on October 10, 2017, per the amortization should have been $81,203.78[,] and not $88,536.18. The Trustees should be surcharged for the payoff amount of $7,332.35 incurred because of their failure to pay the loan on a timely basis.").

Next, Co-Trustees argue that the Orphans' Court erred in surcharging them for Tompkins/VIST mortgage payments from Trust funds. *See* Appellants' Brief, at 56. Co-Trustees first claim that, although John was not permitted to execute a mortgage on the Property as a life tenant, John and Kathryn were permitted to do so when acting jointly as co-trustees. *Id.* Co-Trustees also assert that it is "unclear" how John would have been able to receive income or principal distributions for his "well-being" and "beneficial enjoyment" without mortgaging the Property. *See id.* at 57-58. Further, Kathryn claims there is no evidence of self-dealing because she did not personally receive proceeds of the Tompkins/VIST Mortgage, *id.* at 62, and that John executed the Mortgage without her knowledge by forging her signature on the bank documents. *Id.* at 60. Furthermore, IKOR claims its connection to the payments is "attenuated" because no IKOR representative lived in the Property or received mortgage or real estate proceeds. *Id.* at 63.[10]

_____

[10] Co-Trustees again claim that there was no actual loss to the Trust because the Tompkins/VIST mortgage payments were less than the payments made toward Hatboro Mortgage principal. *Id.* at 56. However, as discussed *supra*, John and Kathryn's payments on the Hatboro Mortgage were required and
*(Footnote Continued Next Page)*

- 14 -

The Orphans' Court determined that, pursuant to 20 Pa.C.S.A. § 7504(a)(1)-(2), Kathryn committed a breach of fiduciary duty insofar as she reimbursed herself for the amount owed on a mortgage or alienation of property that was forbidden by the express terms of Article III of the Trust and IKOR is liable inasmuch as it acquiesced in the improper use of trust funds. **See** Adjudication, 10/17/21, at 8. We agree.

In **Kenworthy v. Levi**, 63 A. 690 (Pa. 1906), our Supreme Court determined that a power given to a trustee to sell generally includes a power to mortgage, but a proviso against encumbering the estate amounts to a prohibition against mortgaging it. **Id.** at 691. Instantly, Article VIII of the Trust provides John and Kathryn as co-trustees the power to sell the Property. However, Article III of the Trust **expressly** prohibits John, as a life tenant, from mortgaging the residence. **See** Trust Article III ("under **no circumstances shall [John] mortgage**, encumber, alienate, or in any way transfer or assign his beneficial life interest or any rights therein tantamount to ownership in such real estate."). This language is "clear and articulate." **In re Estate of Loucks**, 148 A.3d 780, 782 (Pa. Super. 2016). Because John is both a trustee with a power to sell **and** a life tenant prohibited from encumbering the property, to permit John to mortgage the Property **in any capacity** would conflict with Settlor's explicitly stated intent to prohibit John

_____

cannot act to counter the Tompkins/VIST LOC payment made from trust funds. **See supra**, Appellant's Issue one.

- 15 -

from exercising privileges tantamount to ownership. *Id.* at 782 ("the pole star in every trust . . . is the settlor's intent and that intent must prevail") (citation omitted). Accordingly, because both Kathryn and John were needed to conduct business of the Trust and John was not permitted to mortgage the Property, the Tompkins/VIST mortgage is not a valid debt of the trust. Thus, Kathryn was prohibited from using Trust funds to pay its remaining balance.

Next, Co-Trustees claim that the only way to create Trust income to provide for John's "well-being" and "beneficial enjoyment" was to execute a mortgage. Appellant's Brief, at 58. This argument is essentially that the mortgages were proper distributions to John. However, John and Kathryn, as co-trustees, were provided the power to lease the Property, thus, giving them the option to create rental income. *See* Trust, Article VIII. Accordingly, this claim provides them no relief.

Further, Kathryn's claim that she did not personally receive proceeds of the Tompkins/VIST Mortgage is of no moment. A trustee has a duty to adhere to the terms of the trust. *See* 20 Pa.C.S.A. § 7771 ("Upon acceptance of the trusteeship, the trustee shall administer the trust in good faith, in accordance with its provisions and purposes[.]"). Here, Kathryn breached that duty when she and John executed a line-of-credit backed by a mortgage on the Property, which was used to pay back two previous mortgages also improperly executed on the Property at Tomkins/VIST Bank. *See* N.T. Hearing on Objections, 11/15/21, at 71.

IKOR's claim that its connection is too far removed for them to be at fault is meritless. Pursuant to 20 Pa.C.S.A. § 7773(g), "Each trustee shall exercise reasonable care to: (1) prevent a co[-]trustee from committing a breach of trust involving fraud or self-dealing; and (2) compel a co[-]trustee to redress a breach of trust involving fraud or self-dealing." Because IKOR acquiesced in the use of Trust principal to pay the reminder of this mortgage, it breached its duty of reasonable care and, thus, is equally liable.

Further, Kathryn's assertion that she did not know the Property had been mortgaged because John forged her signature affords her no relief. Kathryn conceded she knew John forged her signature on a mortgage before he died. **Id.** at 71 (Kathryn testifying after John's death "I wanted to know what [John] had done with a mortgage he had taken out using my forged signature, because he acknowledged that to me"). Kathryn also knew that both her and John's signatures were needed to conduct trust business. Under these circumstances, Kathryn should have contacted the bank immediately to inform herself about the circumstances of the mortgage and, thus, breached her duty of reasonable care by failing to do so. This delay prevented immediate redress of John's breach of trust, **see** 20 Pa.C.S.A. § 7773(g)(2), and protected only John's accounting business.

When Kathryn and IKOR used Trust funds to pay back a forbidden line-of-credit, this resulted in a loss to the Trust.

In light of the foregoing, the Orphans' Court did not abuse its discretion in surcharging Kathryn and IKOR for payment of the Tomkins/VIST LOC. **See Warden**, **supra**.

Next, Co-Trustees argue that the trial court's calculation of the final amount to be distributed is $151,509.26 too high. **See** Appellant's Brief, at 33. They claim the Orphans' Court either made an unexplained mathematical error or double counted the surcharges as well as an income tax payment, and omitted an income tax payment to which the Sletten Children's objection was withdrawn. **Id.**

The Orphans' Court listed items which it believed were legitimate deductions of the Property's sale price of $462,500.00 and ultimately determined that $379,044.22 remained to be distributed. Those legitimate deductions are as follows:

| | |
|---|---|
| Hatboro Mortgage Fees (less late payments): | $ 81,203.78 |
| Accurate Radon Control: | $ 925.00 |
| Anthony Maletto: | $ 125.00 |
| Associates Group Abstract, Inc. Courier FedEx: | $ 25.00 |
| Associates Group Abstract, Inc. Tax Certification Reimbursement: | $ 55.00 |
| Associates Group Abstract, Inc. Escrow Fee: | $ 22.50 |
| FedEx: | $ 50.00 |
| John Colbridge – Lawn Services prior to closing: | $ 780.00 |
| Juliet Scavello: | $ 3,500.00 |
| KJS Flight: | $ 662.80 |
| KJS Hotel: | $ 16.62 |
| KJS Hotel: | $ 109.17 |
| Stanley Steamer: | $ 700.66 |
| Maletto Repairs: | $ 1,800.00 |
| Mont. Co. Sewer: | $ 127.13 |
| Water: | $ 449.60 |
| Re/Max Centre Broker Commission: | $ 20,812.50 |

| | |
|---|---|
| Re/Max Centre Settlement: | $ 135.00 |
| ReQuire Inc.: | $ 70.00 |
| TCB Closing – Notary: | $ 20.00 |
| TCB Closing – Deed: | $ 75.00 |
| Hall, Albright, Garrison & Barnes (Accounting firm): | $ 757.00 |
| CPA fee: | $ 80.00 |
| Homeowners, Inc. | $ 2,141.30 |
| PECO: | $ 1,988.96 |
| Water (NWWA): | $ 134.[2]6 |
| [Horizon] Waste: | $ 252.00 |
| Yard: | $ 30.00 |
| Four Flag Repairs: | $ 3,495.00 |
| Correspondence: | $ 22.95 |
| MTMSA Sewer: | $ 407.23 |
| Castella Lawn Servicie: | $ 700.00 |
| PA DOR Transfer Tax: | $ 4,625.00 |
| Fiduciary Income Tax: | $ 2,252.00 |

Trial Court Opinion, 3/30/22, at 7-8.

However, upon recalculating this list of "legitimate deductions" we find the total to be $128,549.96. Accordingly, pursuant to this list, the amount remaining to be distributed should be $333,950.04, not $379,044.22. We find further error in that the Orphans' Court neither included the following in legitimate expenses nor surcharged Kathryn and/or IKOR for the same:

- $350.00 to Marc Bootel for Property appraisal (date: 8/24/18).
- $150.00 to Anthony Maletto (date: 10/10/17).
- $16,501.55 to Hatboro Mortgage after Kathryn no longer resided in Property (date: 8/24/18).
- $14,144.00 to United States Treasury (date: 4/17/18).

*See* Second Accounting, 8/28/18.

In light of the foregoing, we remand for the Orphans' Court to clarify the amount remaining for distribution.

Finally, Co-Trustees appeal the denial of attorneys' fees and the Sletten Children request that this Court award sanctions, in the form of attorneys'

fees, for defending this "frivolous" appeal. It is well settled that "[t]he fixing of fees for services of counsel in the settlement of an estate, or other matter under the eye of the court, rests largely in the judgment of the court below, and its decision will not ordinarily be disturbed on appeal." ***In re Berkowitz's Estate***, 26 A.2d 295, 295 (Pa. 1942).

Co-Trustees claim that the Orphans' Court misapplied the law when it failed to follow the reasonableness standard for attorneys' fees and incorrectly allocated the burden of proof to the Co-Trustees. ***See*** Appellant's Brief, at 38. Co-Trustees also assert that the Orphans' Court ignored evidence of record, including 35 pages of invoices showing a total of $70,000.36 in fees earned. ***Id.*** at 39. They assert that administrative work necessitates attorneys' fees and that the Orphans' Court was incorrect in its determination that the invoices were unclear as to what period of time they covered because the invoices are dated, include a description of the services performed, the time spent and hourly rate, and the balance due. ***Id.*** at 45. Additionally, Co-trustees claim that the invoices matched the court's docket and it is unclear why the court only reviewed the reconciliation page, summarizing the fee invoices. ***Id.***

The Orphans' Court denied Kathryn/Co-trustee's request for attorneys' fees, concluding the fees were unreasonable where they were incurred in connection with her breach of fiduciary duty and that it "could not discern what billings [from Montco Elder Law] were attributable to the breach of fiduciary duty on the Tompkins/VIST LOC, as opposed to the other necessary

- 20 -

aspects of trust administration." Orphans' Court Opinion, 3/30/22, at 14-15, 19. We agree.

Pursuant to 20 Pa.C.S.A. § 7769, a trustee is entitled to reimbursement from trust property for expenses properly incurred in trust administration. *See id. See also id.* at § 7775 ("in administering a trust, the trustee may incur costs that are reasonable in relation to the trust property, the purposes of the trust[,] and the skills of the trustee."). Additionally, "[r]eimbursement under [section 7769] may include attorney's fees and expenses incurred by the trustee in defending an action. However, a trustee is not ordinarily entitled to attorney[s'] fees and expenses if it is determined that the trustee breached the trust." *See id.* at § 7769, comment. *See also Lessig. v. Natl. Iron Bank of Pottstown*, 20 A.2d 206, 207 (Pa. 1941) (trustee not entitled to reimbursement where trustee's wrongdoing necessitates the incurring of attorneys' fees).

Additionally, "[a]ttorneys . . . seeking compensation from an estate have the burden of establishing facts which show the reasonableness of their fees and entitlement to the compensation claimed." *In re Estate of Rees*, 625 A.2d 1203, 1206 (Pa. Super. 1993). In determining whether a proposed fee is fair and reasonable, the Orphans' Court shall consider the following facts and factors:

> The amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and

standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*In re LaRocca's Trust Estate*, 246 A.2d 337 (Pa. 1968).

Instantly, Kathryn hired Montco Elder Law as counsel when the Sletten Children first challenged the Trust. N.T. Hearing on Objections, *supra* at 165. During Montco Elder Law's representation, which included preparing both accountings, the previous appeal at docket 2289 EDA 2018, and this appeal, they accumulated approximately $70,000.00 in legal fees. Montco Elder Law also communicated with remainder beneficiaries and responded to their document requests. *Id.* at 166. Kathryn and Montco Elder Law submitted invoices showing attorney time entries. *See* Exhibit H.

However, Montco Elder Law's invoices date back to March 20, 2017 and each entry contains only a brief and broad description of the work performed, lacking sufficient detail to allow the court to determine whether the work performed was valid trust administrative work or work related to defending Kathryn's position regarding the invalid mortgages. Further, at the hearing in this matter, Co-trustees provided minimal testimony in support of their fee request and failed to provide the Orphans' Court with information to determine whether the fees were reasonable under the *LaRocca* factors. Kathryn's testimony as to fees was minimal and vague, *see* N.T. Hearing on Objections, 11/15/21, at 165-85, and no testimony from counsel was presented. Because it is not the Orphans' Court's obligation to comb the record in an attempt to ascertain which time entries are properly chargeable to the Trust, or to *sua*

- 22 -

*sponte* illicit testimony regarding the basis for and reasonableness of fees, we are constrained to conclude that the Co-Trustees have failed to meet their burden of proof, **Rees**, **supra**, and thus, the Orphans' Court did not err in denying their request for attorneys' fees.

Kathryn also claims she received legal advice from Attorney Richard Magee and that he is owed $1,000.00 in legal fees. However, no documentation of the work he performed, or the fee structure agreed to, was submitted into evidence. The only record document related to Attorney Magee's representation is an e-mail from Attorney Magee to Kathryn stating that he is no longer able to represent her. **See** Exhibit K.

The trial court did not abuse its discretion in denying payment of a $1,000.00 fee owed to Attorney Magee, as there is no invoice provided in the certified record. Further, and most importantly, Attorney Magee's legal advice consisted of telling Kathryn that she was not permitted to use proceeds from the sale of the house for her own benefit (to pay off the mortgage on her home in Alabama). **See** N.T. Hearing on Objections, 11/15/21, at 162-63. The trust provided no semblance of ownership in the Property to Kathryn and the advice of counsel was unnecessary to enable her to reach the conclusion that she was not entitled to the proceeds of the sale of the Trust corpus.

In their cross appeal, the Sletten Children claim they are entitled to attorneys' fees because Co-Trustees filed a frivolous appeal. **See** Appellees'/Cross-Appellants' Brief, at 32. Pursuant to Pa.R.A.P. 2744, if an appellate court "determines that an appeal is frivolous or taken solely for delay

or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate[,] or vexatious" then an appellate court may award attorneys' fees as may be just, including damages for delay at the rate of 6% per annum in addition to legal interest.

> In determining the propriety of such an award, we are ever guided by the principle that an appeal is not frivolous simply because it lacks merit. Rather, it must be found that the appeal has no basis in law or fact. This high standard is imposed in order to avoid discouraging litigants from bringing appeals for fear of being wrongfully sanctioned.

*Menna v. St. Agnes Medical Center*, 690 A.2d 299, 304 (Pa. Super. 1997). Where fees are requested, the proper procedure is for this Court to remand the matter to the trial court for the determination as to the appropriate sanction. *See* Pa.R.A.P. 2774.

Instantly, the Sletten Children assert that Co-Trustees conceded that the Tompkins/VIST LOC is not a valid trust debt in an e-mail sent to Tomkins/VIST Bank, and, thus, Co-Trustees' appeal is frivolous. *See* Exhibit J (September 29, 2017 e-mail from Montco Elder Law to Tomkins/VIST bank asserting because John forged Kathryn's signature on the document, the mortgage is invalid). The Sletten Children also claim the appeal is frivolous because, if the Tomkins/VIST mortgages were truly distributions to John, they should have been included in the accounting as such. *See id.* at 33-34 (Sletten Children asserting "it is obvious that [Co-]Trustees invented the supposed 'offsets' and 'distributions' in an attempt to avoid [already imposed] surcharges[.]"). We disagree.

In the September 28, 2017 e-mail, Co-Trustees attempt to demonstrate **to Tomkins/VIST bank** that the Tomkins/VIST LOC is invalid due to Kathryn's forged signature. The fact that Co-Trustees later made this same claim to **the court** does not render Co-Trustees' appeal frivolous. To conclude otherwise would make the bank, rather than the court, the final arbiter. Additionally, Co-Trustees failure to include the Tompkins/VIST LOC as distributions to John in the accountings, does not conclusively show that the mortgage was not an attempt at providing John income. Co-Trustees' claim, although meritless, is an attempt to use the facts at issue to demonstrate that the Orphans' Court determination was incorrect, which is the purpose of an appeal.

Furthermore, on appeal, Co-Trustees not only raised issues regarding the Tompkins/VIST LOC, but also: (1) asserted that the Hatboro Mortgage surcharge was in error; (2) requested attorney's fees stemming from earlier Trust litigation in which they prevailed; and (3) **successfully** argued that the Orphans' Court miscalculated "legitimate deductions," and consequently, misstated the amount available for distribution. Accordingly, the appeal was not frivolous and the Sletten Children's request for sanctions is denied.

Orders affirmed in part and reversed in part. Case remanded for further proceedings to determine the monetary amounts to be distributed to beneficiaries. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/27/2023</u>